**UNITED ASSET COVERAGE, INC., a Delaware Corporation Plaintiff,**

v.

**AVAYA INC., a New Jersey Corporation Defendant**

**No. CIV.A. 05C4350.**

United States District Court, N.D. Illinois, Eastern Division.

Jan. 12, 2006.

Michael Rowe Feagley, Agostino Lorenzini, Debra Rae Bernard, Diane Green-Kelly, John Norman Maher, Richard M. Assmus, Richard Thomas Ruzich, Mayer, Brown, Rowe & Maw LLP, Chicago, IL, for Plaintiff.

Steven Russell Smith, Bryan Cave LLP, Chicago, IL, J. Michael Cooper, Bryan Cave LLP, Washington, DC, Robert T. Egan, Archer & Greiner, PC, Haddonfield, NJ, for Defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

SHADUR, Senior District Judge.

During a number of days between October 25 and November 21, 2005 this Court conducted an evidentiary hearing on the motion brought by United Asset Coverage, Inc. ("UAC"), seeking to obtain the issuance of a preliminary injunction against Avaya, Inc. ("Avaya"). After the evidentiary proofs were closed on November 22, each side submitted its proposed Findings of Fact ("Findings") and Conclusions of Law ("Conclusions"), then filed responses to the other side's proposals. This Court has reviewed those submissions in detail, and what follows are its own Findings and Conclusions.

To the extent (if any) that the Findings as hereafter stated may be deemed conclusions of law, they shall also be considered Conclusions. In the same way, to the extent (if any) that matters later expressed as Conclusions may be deemed findings of

fact, they shall also be considered Findings. In both of those respects, see *Miller v. Fenton,* 474 U.S. 104, 113–14, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985). But before the Findings and Conclusions are set out, a brief introduction is in order.

### *Introduction*

UAC begins its Response to Avaya's proposals by stating in its own "Introduction" section:

> This case presents a carbon-copy reenactment of the antitrust violation described in *Eastman Kodak Co. v. Image Tech. Services, Inc.,* 504 U.S. 451, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) ("*Kodak*"), in which an equipment manufacturer uses its control over an essential input as a means to monopolize the aftermarket for servicing its equipment and to crush competing service providers.

Nothing could be farther from the truth. Instead there are major nonparallels between the two cases that doom UAC's effort to portray *Kodak* as an all-fours precedent that controls the result here. It simply does not.

For one thing, it must be remembered that the *Kodak* opinion was rendered in a totally different context: It reversed a summary judgment in Kodak's favor because, as the Supreme Court held, the facts, when taken most favorably to the independent service providers in that case (together with all reasonable inferences in their favor), posed a genuine issue of fact as to the relevant market definition—that is, whether service and parts for Kodak equipment *could* constitute two separate markets, a determination that could be made "only after a factual inquiry into the 'commercial realities' faced by consumers" (504 U.S. at 482, 112 S.Ct. 2072). By contrast, the very different question here is whether UAC has presented a sufficient showing to justify granting the extraordinary relief of a preliminary injunction under the standards applicable to such relief, a determination that would have to embrace a finding as to the existence of separate markets on a merits-based evaluation of the evidence. What the following Findings and Conclusions amply demonstrate is that UAC has not made its case in that respect.

And for another thing, when the underbrush is cleared away UAC is exposed as seeking to compel Avaya to grant licenses that would give unauthorized party UAC access to Avaya's wholly proprietary intellectual property embedded in software, a kind of "cooperation" that Avaya has not volunteered in the past. By contrast, the background situation in Kodak involved the company's switch to a refusal to sell replacement parts—physical property that it had previously sold and in which it had no such proprietary rights—to the independent service providers with whom the company competed for maintenance of its equipment. It is worth noting that here UAC does not itself engage in service or maintenance—it rather wishes to obtain access to Avaya's software in violation of the nonassignable licenses, running to others, that grant such access to those licensees alone. Again the Findings and Conclusions that follow defeat UAC's effort at this threshold stage of the case.

One added point should be made before this Court turns to its Findings and Conclusions. It has long used *Roland Mach. Co. v. Dresser Indus., Inc.,* 749 F.2d 380 (7th Cir.1984) as its model for consideration of preliminary injunctive relief, because that opinion has provided the most detailed and reasoned exposition of the standards for such relief. For the same reason, this Court continues to look to *Roland* in this case.

But with that said, one caveat should be kept in mind: *Roland, id.* at 387 regretta-

bly provides some potential for misunderstanding—something that is sought to be seized upon by UAC—when the court quotes earlier caselaw as confirming the potential grant of preliminary relief if "the plaintiff's chances are better than negligible." That is indeed so, but it is properly understood only in conjunction with the "sliding scale" approach explained in *Roland, id.* at 387–88: Such a low hurdle for a plaintiff's likelihood of success is proper only if the balance of harms weighs very heavily in plaintiff's favor. In the Findings and Conclusions that follow, this Court (as it has always done) holds UAC to a substantially more demanding likelihood-of-success standard because UAC does not fare at all well in the balancing-of-harms analysis.

### Findings of Fact
### United Asset Coverage, Inc.

1. UAC was founded in 1997 and is headquartered in Naperville, Illinois. D–83 at UAC 00008.

2. UAC represents that it provides "maintenance, repair and replacement coverage for virtually every make and model of telecommunications, data networking and office productivity equipment" through master service agreements with its clients. D–83 at UAC 00007 & 00011; Tr. 10/26/05 a.m. at 56:18–57:9 (Testimony of Patrick Martucci ("Martucci")).

3. Among the types of telecommunications equipment for which UAC provides coverage are private branch exchanges ("PBXs"). See Verified Compl. ¶ 18.

PBXs are the predominant traditional voice switching systems used in mid-to-large-sized enterprises to connect the public voice network with the telephones and other communications stations at enterprise locations. Remote alarming software, fault resolution software and firmware capabilities used to maintain PBXs are built into the computer-like processors of PBX systems, including PBXs designed and built by Avaya. D–173 at 9–10 and 15–16; Tr. 10/25/05 p.m. at 31:12–33:12 (Martucci testimony). UAC does not design or build any type of telecommunications equipment. Tr. 11/7/05 a.m. 37:15–17 (Testimony of Lauren Stiroh ("Stiroh"), UAC opinion witness as to economics). (COCO)[1]

4. UAC provided no equipment maintenance itself before June 13, 2005. Tr. 10/26/05 a.m. at 56:18–57:9 (Martucci testimony); D–83 at UAC 00020. Instead, when a PBX required maintenance, UAC or its client selected a vendor to provide the maintenance on a time-and-material ("T & M") basis. UAC charges its clients a fixed fee under its maintenance contracts, and in return UAC agrees to cover payments made to vendors for maintenance of its clients' PBXs. D–83 at UAC 00020; Verified Compl. ¶ 36 ("Avaya would bill the end user who received the maintenance service who, in turn, presented UAC with the bill for payment.") D–83 at UAC 00007, 00008 & 00020. UAC claims that its "solution provides clients increased control, choice and savings by combining the benefits of time and materi-

---

1. "COCO" is used in these Findings and Conclusions to identify recitals or summaries of specific information contained in documents or deposition testimony designated by UAC or third parties as "Confidential–Outside Counsel Only" under the terms of the September 8, 2005 Agreed Protective Order, or contained in testimony given at the preliminary injunction hearing when persons to whom the Agreed Protective Order prohibited disclosure of in-formation designated "Confidential–Outside Counsel Only" were excused from the courtroom. Most of the portions of these Findings and Conclusions that are identified by the term "COCO" recite or summarize "Confidential–Outside Counsel Only" deposition testimony of three UAC witnesses whose entire transcripts UAC designated as "Confidential–Outside Counsel Only."

als-based service such as vendor choice, improved response times and quality control, with the fixed cost and security of a maintenance agreement." D–83 at UAC 00008.

5. Stiroh testified that UAC provides an "insurance service." Tr. 11/07/05 a.m. at 17:17–20. RR Donnelley, one of the two UAC clients that UAC has deposed, characterized UAC as an "insurance company." Oct. 7, 2005 deposition of Judy Gorski ("Gorski Dep.") at 91:7–17. UAC characterized itself in writing in 1998 to the second client it deposed, Retirement System Group, as "a financial services company," and that client still considers UAC to be a "financial services company." D–155; Sept. 26, 2005 deposition of John Kocay ("Kocay Dep.") at 78:6–79:12.

6. Before the June 13, 2005 closing of its transaction with NextiraOne, UAC did not employ technicians that were dispatched to client locations to perform PBX maintenance. Oct. 13, 2005 deposition of Martucci ("Martucci Dep.") at 55:22–56:9. For PBXs manufactured by Avaya and owned by UAC clients, either Avaya or an Avaya authorized dealer ("Business Partner") provided service on a T & M basis in almost all cases before July 1, 2005. Tr. 10/28/05 a.m. at 28:4–14 (Testimony of Rick Lochner ("Lochner")). (COCO)

7. UAC operates a client service center that it says "responds to its clients' service needs 24 hours a day, seven days a week, by helping them find and access maintenance vendors to perform repairs while ensuring the service event is completed in a timely fashion." D–83 at UAC 00020.

8. UAC also offers PBX equipment owners a remote monitoring system called "Asset Watch Positive System Monitoring" that it says "screens, on a 24 × 7 basis, for both major and minor alarms." D–83 at UAC 00008.

9. In September 2003 UAC provided maintenance coverage for approximately 900 clients. D–83 at UAC 00007. As of June 12, 2005 UAC provided maintenance coverage for a little over 900 clients and used 700 to 800 "active" vendors to provide service. Tr. 10/25/05 p.m. at 80:22–81:16 (Martucci testimony).

10. Martucci, UAC's Chairman and Chief Executive Officer, testified at the hearing that UAC's "competency was to be able to deliver an Avaya solution." Tr. 10/25/05 p.m. at 96:6–23. By early 2005 maintenance of Avaya PBXs represented 80% of UAC's business. Tr. 10/25/05 p.m. at 82:23–83:1 (Martucci testimony). Martucci also testified that UAC clients who owned Avaya equipment were UAC's "most profitable customer[s]" until July 1, 2005, with UAC "enjoying 70 percent profit margins" in its business with those customers. Tr. 10/26/05 p.m. at 21:9–23.

11. In May 2002 UAC reorganized and reduced its workforce by one-half. Approximately 50 sales people were among the personnel that UAC terminated. Oct. 12, 2005 deposition of Mario Christopher ("Christopher Dep.") at 118:19–120:16. (COCO)

12. In 2003 UAC intentionally decided not to expand its business. Martucci testified that UAC did this to deleverage and "to demonstrate the true [value] of [its] base" in contemplation of a recapitalization in 2004. Martucci also testified that UAC demonstrated "stand-still, no-top-line growth . . . for 18 consecutive months, allowing the company to maximize cash flows, demonstrate that the margins in [UAC's] business were strong . . . ." Martucci Dep. at 97:24–100:13. (COCO)

13. During 2004 UAC increased its sales force by about 50 people, and it had 125 total employees at the end of the year. UAC's revenues in 2004 were approximately $28.7 million, about $3 million less than UAC had planned and $4 million less than UAC's 2003 revenues. D–99; Tr.

10/26/05 p.m. at 3:5–5:16 (Martucci testimony).

14. In 2004 UAC used its "attrition rate" as one metric to measure its performance. Attrition rate is the inverse of the rate of renewal of UAC's maintenance contracts calculated on the basis of contract value. UAC's attrition rate in 2004 was 33%, or more than double UAC's planned attrition rate of 15%. Christopher Dep. at 138:12–139:8; D–99. (COCO)

15. Christopher, UAC's Chief Financial Officer, attributed UAC's revenue shortfall in 2004 to its higher-than-planned attrition rate. To address its high attrition rate, UAC took steps at the end of 2004 to improve the delivery of maintenance service to its clients. Christopher Dep. at 151:21–155:13, 155:20–156:7, 156:13–157:8, 157:19–158:23; D–98; D–99. (COCO)

16. At the hearing Martucci conceded that UAC responded to its high attrition rate in 2004 by hiring a new Vice President of Customer Care and reorganizing its customer care operations. Tr. 10/26/05 p.m. at 7:21–8:8. As another stated reason for the decline in UAC's revenues in 2004, Martucci testified that UAC was "more concerned with and more focused on [its] earnings" than it was on its revenues. He further testified that UAC would abandon relations with customers that had not proved to be sufficiently profitable, suggesting that this contributed to UAC's revenue shortfall in 2004:

> So for a customer, for example, that doing the final analysis we look and we say we have worked very hard and done a lot of work and at the end of that term you realize while that customer provides a lot of revenue, it doesn't provide a lot of profit, then we would choose not to renew that customer and only focus on

our most profitable customers that hit the EBIDTA target, which we did.

Tr. 10/26/05 p.m. at 22:20–23:25.

### Avaya Inc.

17. Avaya describes itself as "a leading provider of communications systems, applications and services . . . ." Among its products are Internet Protocol telephony systems and traditional voice communications systems, including PBXs. P–337 at 1. Avaya's predecessor companies were AT & T until 1996 and Lucent Technologies from 1996 to September 2000, when Lucent spun off Avaya. D–173 at 6 & 8.

18. Avaya regards its service business, including its ability to gain and retain customers for its products, as integral to its success. It also specifically identifies maintenance contracts as a primary revenue source. In that respect Avaya stated this in its FY 2004 Form 10–K:

> We support our broad customer base with comprehensive global service offerings that enable our customers to plan, design, implement, maintain and manage their communications networks. We believe our global service organization is an important consideration for customers purchasing our products and applications and is a source of significant revenue for us, *primarily from maintenance contracts*. The skilled professionals of our services organization, together with our networks of business partners and our ability to diagnose customer network faults remotely, can provide 24 hours a day, seven days a week service to our customers around the world.

P–337 at 1 (emphasis added).

19. In FY 2004 Avaya's total revenues were $4.069 billion. Fifty percent of Avaya's revenues were attributable to services, and 34% (approximately $1.383 billion) to maintenance contracts. P–337 at 2 & 5.

**1014**

20. Avaya's service revenues in North America in the last three years have averaged approximately $1.3 billion, and 95% of those revenues were attributable to maintenance contracts. Tr. 11/08/05 p.m. at 15:2–8 (Testimony of Linda Schumacher ("Schumacher")).

21. Avaya characterizes "[t]he market for communications systems, applications and services ... [as] quickly evolving, highly competitive and subject to rapid technological change." It identifies among its competitors in the sale of equipment Nortel Networks Corporation, Cisco Systems, Inc., Siemens, Alcatel S.A. and NEC Corporation. It identifies as its primary service competitors NextiraOne, LLC, Norstan, Inc., Siemens and Verizon Communications. P–337 at 12.

22. In Martucci's view Avaya PBX equipment is "the most expensive, typically," and that is so because of the "reliability," "useful product life cycle" and "great reputation" of Avaya PBXs. Tr. 10/25/05 p.m. at 38:9–17. In 2004 Avaya had an estimated 17% share of the sales of traditional PBXs, known as time division multiplex ("TDM") PBXs. Its estimated share of the sales of IP–PBXs was 23% in 2004. D–174 at 17–19. "IP Telephony solutions represent a completely new, and disruptive, class of Enterprise Communications systems that have already significantly begun, and are forecasted to eventually completely displace, traditional TDM-based systems." D–173 at 11. Martucci testified that "Avaya is a technology company first and foremost that manufactures voice products and other things. But specifically the voice products and [Avaya's] need to sell and support Voice Over IP general products are very important to [it]." Tr. 10/25/05 p.m. at 40:6–14.

23. Avaya's share of the maintenance and service revenues for Avaya PBXs was estimated in 2003 to have been approximately 50 to 65%. P–14 ¶ 5. Avaya's Business Partners also provide maintenance and service for Avaya's PBXs. Tr. 11/08/05 p.m. at 13:15–14:11 (Schumacher testimony).

24. Avaya invested $348 million, or approximately 8.6 percent of its total revenue, in R & D in FY 2004. P–337 at 11. Avaya's annual R & D budget for its maintenance service business is $50 million. Tr. 11/08/05 a.m. at 41:22–42:9 (Schumacher testimony).

### Purchase of PBX Equipment and Maintenance of PBX Equipment

25. Purchasers of PBX equipment are knowledgeable and sophisticated buyers. They generally are "appropriately educated, trained, and experienced in the exacting operations and requirements of the management of voice communications systems and networks .... [T]hese individuals have typically been continuously involved in the on-going process of replacing, upgrading, and maintaining such systems." Many organizations own multiple PBXs that have been provided by more than one manufacturer either directly or through the distribution channels for the manufacturers' products. D–173 at 12; Tr. 10/25/05 p.m. at 46:6–47:19 (Martucci testimony); Tr. 11/09/05 p.m. at 148:8–149:24 (Testimony of Eric Schmiedeke ("Schmiedeke")).

26. Purchasers often acquire PBX equipment through competitive Requests for Proposals ("RFPs"), use consultants to assist in their purchasing decisions and participate in User Groups for owners of a particular manufacturer's PBX equipment. D–173 at 12–13.

27. Only a small percentage of PBX sales based on the number of line shipments "resulted from new site installations, while the overwhelming majority of CPE (PBX, KTS, IP Telephony) station line shipments stem from either switch replacements or upgrades to the existing

installed base of such systems." D–173 at 13. Thus almost all new sales of PBX equipment are made to present owners of PBX equipment.

28. "Pricing and 'total cost of ownership', which includes maintenance, training, and many other operations costs, have almost always been a major factor in deciding vendor and system selection." D–173 at 12.

29. PBX prices range from $480 to $600 per station line presently, and PBXs can vary in size from 20 to more than 10,000 station lines. Prices for PBXs also depend on the application features and other attributes of particular systems. D–173 at 9–10.

30. On average PBX systems are replaced by some form of new system in 7½ to 8½ years. Approximately 82% of the PBX system lines in place have been installed since 1995. D–173 at 13. Equipment owners can defer replacing PBXs by upgrading existing PBXs, including adding IP capabilities to traditional TDM PBXs. D–173 at 11. In that regard Martucci testified that Avaya has "gone to great lengths to provide a system that does not have to be forklift upgraded when [owners] want to participate in advance technology." Tr. 10/25/05 p.m. at 36:10–37:15.

31. At the point of sale of PBX equipment, Avaya attempts to sell "a complete solution both product and service . . . ." Avaya sets a quota for its direct sales forces of an 80% "attach rate": an objective that 80% of the purchasers of Avaya equipment also enter into post-warranty maintenance contracts with Avaya. Avaya maintenance contracts have an average term of 33 months, and Avaya's sales force's quota is based on a 33–month contract term. Tr. 11/08/05 a.m. at 43:13–46:21 (Schumacher testimony). Avaya always tries to sell PBX owners the highest level of maintenance service. Tr. 11/09/05 a.m. at 4:8–17 (Schumacher testimony).

Martucci admitted at the hearing that most purchasers of Avaya PBX equipment enter into post-warranty maintenance contracts with Avaya. Tr. 10/26/05 a.m. at 55:13–16. More generally, "[m]ost customers make decisions regarding their post-warranty maintenance intentions at the time such systems are purchased (at 'point-of-sale')." D–173 at 14.

32. Stephen Silberman ("Silberman"), Avaya's opinion witness as to economics, stated that the available data does not support a claim that Avaya has monopoly power in the sale of PBX equipment. D–174 at 17–18; see Finding 22. Nor does UAC's economics opinion witness Stiroh contend that Avaya has monopoly power in the sale of PBX equipment. Avaya's main competitors at point of PBX equipment sale in the view of Schumacher, Avaya's Vice President of Services Research and Development and Business Development Organization, are (1) Cisco, (2) Cisco through Business Partners, (3) Nortel through Business Partners, including Nextira One, (4) Siemens and (5) Alcatel. Tr. 11/08/05 p.m. at 2:9–14 (Schumacher testimony); see Tr. 10/25/05 p.m. at 33:13–20 (Martucci testimony).

33. Approximately 76% of PBX lines are covered by maintenance contracts, and most such contracts are between the PBX equipment owner and the seller of the PBX equipment to the owner. As for the remaining 24% of PBX lines, they are serviced through T & M by authorized service providers, by self-maintenance or by unauthorized third-party providers. P–173 at 15. Avaya has estimated that 75% of its Definity PBX owners have maintenance agreements with it, with the remaining 25% of owners choosing "third-party support, time-and-materials (T & M) support from Avaya or another vendor, self-maintenance, or a combination of these." D–75; P–13. "Since most customers have had

little tolerance for risk concerning downtime of their business telephone systems, the princip[al] attraction of having maintenance contract coverage on PBX systems is that most vendors are able to provide customers some form of sophisticated proactive remote system alarm monitoring and/or fault resolution capability under stringent response time and performance objectives for both remote as well as onsite services." D–173 at 15–16.

34. Martucci testified at the hearing that equipment providers "[s]ell the PBX at any price including at cost just to get the Maintenance Agreement. . . . [M]aintenance was just a market-driven number that provided profits to manufacturers or people who were selling PBXs, frankly, to try to recapture the margin they didn't get on the equipment sale." Tr. 10/25/05 p.m. at 35:6–25. Silberman states in his report that competition in sale of PBXs such as that suggested by Martucci's testimony "can protect customers by driving equipment prices down to a level where vertically integrated firms [like Avaya] earn only competitive profits from supplying both equipment and service" when competing sellers or equipment purchasers are knowledgeable. Silberman points out that in such circumstances competition in the sale of equipment assures "competitive life-cycle prices for equipment plus maintenance service" at the point of equipment sale. D–174 at 5. For that and other reasons, maintenance for Avaya PBXs alone is not properly regarded as a relevant product market for antitrust purposes. See D–175 at 2–3.

35. Stiroh concedes that changes in the terms and conditions of PBX maintenance offered by PBX sellers affect competition in the sale of equipment. In particular she testified that a consultant who "speaks highly of the Avaya equipment is then less favorable to Avaya as a[n] overall product to purchase because of its MSP policies

post-purchase." Tr. 11/07/05 a.m. at 56:12–58:8. Silberman further points out that because Avaya faced substantial competition in the sale of PBX equipment (a business that it has demonstrated no interest in leaving), it has little incentive to exploit present Avaya PBX owners by arbitrarily increasing their maintenance costs (information that would quickly be learned by prospective PBX purchasers). Accordingly, even if maintenance for Avaya were deemed a distinct antitrust market, in which Avaya had market power, Avaya's conduct in that market remains constrained by the competition it faces in the sale of PBX equipment. D–174 at 17–19.

36. UAC does not compete with Avaya for maintenance contracts at the point of Avaya PBX equipment sale. Tr. 11/08/05 a.m. at 49:8–10 (Schumacher testimony). There is no evidence in the record that UAC ever entered into a maintenance contract with an Avaya PBX equipment owner at the point of the equipment sale. All of UAC's clients that own Avaya PBX equipment previously had an Avaya maintenance contract. Tr. 10/25/05 p.m. at 16:15–18:15 (Martucci testimony).

### Avaya's Maintenance Contracts and T & M Service

37. Avaya offers a number of maintenance options. Its Full Coverage 8x5 maintenance contract includes 24–hour remote maintenance that features fault/alarm monitoring and resolution using Avaya's EXPERT Systems. According to Avaya, EXPERT Systems "provide[s] quick response time, proactive remote diagnostics and resolution and lessens the need to dispatch a technician." Costs for technician services, either remote or on-site, are covered by the 8x5 contract during the business day, and Avaya agrees to a 2–hour response time in major metropolitan areas and a 4–hour response time

elsewhere. Avaya's Full Coverage 24x7 maintenance contract is essentially the same as the 8x5 coverage, except that it also covers the costs of technicians' services for major outages on a 24–hour–per–day, 7–days–per–week basis. Avaya also offers contracts that provide only remote support for monitoring, diagnostics and resolution. P–206; Tr. 11/08/05 a.m. at 51:17–52:10 (Schumacher testimony).

38. Avaya provides remote and on-site technician services that would otherwise be covered by its Full Coverage maintenance contracts on a T & M basis to owners of its PBX equipment who do not have Full Coverage contracts with Avaya. Equipment owners who choose to rely on T & M services do not receive Avaya's 24–hour–per–day, 7–days–per–week remote monitoring, diagnostics or resolution support. They are charged for all calls for support and all on-site technician services. Avaya's objective has been to provide support to equipment owners choosing T & M by 5 p.m. of the next business day, based on technician availability after giving priority to Avaya equipment owners who have Avaya maintenance contracts or have equipment under warranty. P–206.

39. Avaya believes that its maintenance contracts are important to its sales of PBX equipment. It has "found that the customers that have a better service experience actually are more likely to buy again the product, upgrade, add new sites on with that manufacturer." Avaya invests heavily in its services infrastructure and R & D "because of that combination ... of the product and the services." T & M service, even if provided directly by Avaya, is only "best efforts," and does not include remote monitoring, diagnostics and resolution, and thus is inherently slower. Avaya therefore believes it is at greater risk to lose the next PBX equipment sale made to an owner using T & M than it is to lose the next PBX sale made to an owner with a mainte-

nance contract. Tr. 11/08/05 a.m. at 65:19–66:16 (Schumacher testimony); Tr. 11/07/05 p.m. at 152:8–22 (Testimony of Jerry Peel ("Peel")). Avaya's beliefs in this regard have been borne out by "[c]ustomer research and 'win-loss studies' conducted on behalf of vendors [that] have consistently indicated that customers consider maintenance service performance and reputation as the most important criteria in determining supplier selection with respect to future equipment purchases and continuation of existing maintenance contracts." D–173 at 16–17.

40. Avaya has approximately 20,000 maintenance contracts and agreements with owners of its PBXs. Its current renewal rate for maintenance contracts is 85%. Tr. 11/08/05 a.m. at 49:13–50:8 (Schumacher testimony). Approximately 95% of Avaya's maintenance revenue is attributable to maintenance contracts. Tr. 11/08/05 p.m. at 15:6–8 (Schumacher testimony).

### Maintenance Code and Maintenance Software Permissions

41. PBXs are essentially special purpose computers that manage phone lines. Sept. 26, 2005 deposition of Leo Malone ("Malone Dep.") at 43:20–44:1. PBXs contain hardware, firmware and a variety of software. Software contained in Avaya's and its predecessors' PBXs includes "call processing code" that processes and gathers information, routes calls and creates the features of PBXs. Tr. 11/21/05 p.m. at 95:17–22 (Testimony of David Scoville ("Scoville")). That software also includes "administration code," which can be used to configure PBX systems and set up attributes for the telephones on the systems. Tr. 11/21/05 p.m. at 96:8–13 (Scoville testimony). Finally, the software and firmware include "maintenance code," which helps to check the health of the system and to diagnose and troubleshoot prob-

lems. Tr. 11/21/05 p.m. at 96:14–19; 98:7–24 (Scoville testimony).

42. Maintenance software code on AT & T, Lucent and Avaya PBXs was first written by AT & T Bell Labs around 1980. Tr. 11/21/05 p.m. at 125:2–7 (Scoville testimony). Thereafter maintenance code was written by employees and contractors of AT & T Bell Labs, Lucent and Avaya, with all the later changes and development being based upon the original Bell Labs code. Tr. 11/21/05 p.m. at 125:2–126:15 (Scoville testimony).

43. Avaya regards and treats the software code for its PBXs as confidential. Tr. 11/21/05 p.m. at 133:18–20 (Scoville testimony).

44. Contractors who have done software development work have signed agreements (such as D–230) under which, among other things, they assigned their rights to the computer programs and other works of authorship that they developed and agreed to keep confidential proprietary and private information (D–230 ¶¶ A, C). Tr. 11/21/05 p.m. at 129:17–21; 130:15–131:23 (Scoville testimony). Similarly, all new Avaya Research and Development employees have been required to sign agreements in the form of D–231, which Avaya has used since it became Avaya, under which, among other things, the employees assigned their rights to the computer programs and other works of authorship that they developed and agreed to keep confidential proprietary and private information (D–231 ¶¶ A, C). Tr. 11/21/05 p.m. at 131:24–132:1; 132:11–133:10 (Scoville testimony). Similar employee agreements have been used since at least 1977. Tr. 11/21/05 p.m. at 133:7–10 (Scoville testimony). Scoville, an AT & T/Lucent/Avaya software developer and Technical Manager since 1977, is not aware of any employee or contractor who has had access to the code for PBXs that has not signed such an agreement. Tr. 11/21/05 p.m. at 93:11–95:16; 133:11–17.

45. In addition to signing agreements, employees or contractors are routinely advised of the confidential nature of the software in annual formal meetings and in regular informal discussions. Tr. 11/21/05 p.m. at 135:12–17 (Scoville testimony).

46. AT & T, Lucent and Avaya have placed confidentiality notices or other kinds of proprietary notices on hard copy or electronic documents that contain the code or materials referring to the code since at least 1977. Tr. 11/21/05 p.m. at 136:7–1 (Scoville testimony).

47. Avaya and its predecessors have restricted access to the software code in several ways. To obtain access to the code, employees and contractors first need the approval to become members of a user group from a Technical Manager, who gives that approval on a "need to know" basis. Tr. 11/21/05 p.m. at 133:21–134:14; 135:18–136:1 (Scoville testimony). Next they must use logins and passwords that have to be of a specified length and contain capital letters, lower case letters, numbers and non alphanumerics. Tr. 11/21/05 p.m. at 134:15–135:2 (Scoville testimony). Passwords must be changed every 90 days. Tr. 11/21/05 p.m. at 135:3–6 (Scoville testimony). Such use of user groups, logins and passwords dates back to at least 1977. Tr. 11/21/05 p.m. at 135:7–11 (Scoville testimony).

48. In addition, personnel need badges to get access to the building in which the software is housed, and a more restricted badge is required to gain access to the computer center. Tr. 11/21/05 p.m. at 136:2–6 (Scoville testimony). Access to the computers from the outside is further limited, requiring supervisory permission to have a virtual private network software installed on PCs and further requiring the use of special keys and IP addresses. Tr.

11/21/05 p.m. at 136:14–137:1 (Scoville testimony).

49. Software code for the PBXs was written in a programming language and is called the "source code." Tr. 11/21/05 p.m. at 137:20–138:1 (Scoville testimony). It resides on computers that are behind a "firewall," which is a software protection mechanism that "blocks access from all but those who have a need to know." Tr. 11/21/05 p.m. at 138:6–13 (Scoville testimony). To Scoville's knowledge, neither Avaya nor Lucent nor AT & T has ever provided the source code to anyone other than its employees and contractors. Tr. 11/21/05 p.m. at 138:2–5. Software code that AT & T, Lucent and Avaya have distributed to customers is called "executable code," which is obtained by technologically translating ("compiling") the source code through the use of a software program called a "compiler." Tr. 11/21/05 p.m. at 138:14–139:19 (Scoville testimony). That executable code distributed to customers can be "reverse compiled" or "disassembled" to an intermediate computer language called "assembly language," but the reverse compiled code would not be very useful. Tr. 11/21/05 p.m. at 139:20–141:4 (Scoville testimony). It would take "many, many people many, many years" to make any good use of the reverse compiled code and translate it back to something that was actually useful. Tr. 11/21/05 p.m. at 141:5–17 (Scoville testimony).

50. Various forms of customer agreements used by Lucent and Avaya contain several provisions protecting the companies' ownership of, and the confidentiality of, the software and documentation that they grant customers a right to use. Thus the form master agreement, entitled "Purchase/Service Agreement," used from June 1996 through August 1998, provided:

14. SOFTWARE LICENSE—A. Lucent grants you a personal, non-transferable and non-exclusive right to use, in object code form, all software and related documentation furnished under this Agreement. Title to and ownership of all software shall remain with Lucent or its suppliers. This grant shall be limited to use with the equipment for which the software was obtained or, on a temporary basis, on back-up equipment when the original equipment is inoperable. Use of software on multiple processors is prohibited unless otherwise agreed to in writing by Lucent. You will refrain from taking any steps, such as reverse assembly or reverse compilation, to derive a source code equivalent of the software or to develop other software. You will use your best efforts to ensure that your employees and users of all software licensed under this Agreement comply with these terms and conditions.

B. You may make a single archive copy of software. Any such copy must contain the same copyright notice and proprietary markings that the original software contains.

\*      \*      \*      \*      \*      \*

D. If the equipment purchased hereunder is sold or assigned to another party, Lucent requires that the new owner or assignee execute a new software license and pay the then current software license fee, if any. Upon written request, Lucent will grant the new owner or assignee of the equipment the right to use any related software, provided the new owner or assignee agrees, in writing, to Lucent's terms and conditions and pays Lucent's then current software license fee. If the new owner or assignee of the equipment refuses to execute a new software license agreement or pay the applicable software license fee, or if the equipment is no longer to be used by you, you shall either return the software, together with any copies, or destroy the software and all copies, and

provide Lucent with prompt written notice of such destruction.

D–212, ¶ 3; D–63. Those restrictions were also contained in two subsequent master "Purchase/Service Agreements" used between May 1999 and June 2003. *Id.*; D–64, 65. In addition, those restrictions were contained in substance in certain of the MSP Addenda that Lucent and Avaya used to grant customers maintenance software permissions. D–228, ¶ 6; D–52, 54, 56, 60.

51. In March 2003 Avaya began to use a form of master agreement that also contained provisions relating to the ownership and confidentiality of the software. Attachment A to that form provided in relevant part:

5. CONFIDENTIALITY

5.1. Confidential Information. The term "Confidential Information" means Software (in object and source code form), Documentation, any technical information related to Products or Services, any work product and deliverables of Services, the terms (but not the existence) of the Agreement, and, if marked or otherwise expressly identified as confidential in writing, any other information or data, regardless of whether in tangible, electronic or other form. Information communicated verbally will qualify as Confidential Information if designated as confidential or proprietary at the time of disclosure and summarized in writing within thirty (30) days after verbal disclosure. Confidential Information does not include materials or information that: (i) is generally known by third parties as a result of no act or omission of the receiving party; (ii) subsequent to its disclosure was lawfully received from a third party having the right to disseminate the information and without restriction on disclosure; (iii) was already known by the receiving party prior to receiving it from the other

party and was not received from a third party in breach of that third party's obligations of confidentiality; or (iv) was independently developed by the receiving party without use of Confidential Information of the disclosing party.

5.2. Protection of Confidential Information. Each party will protect the secrecy of all Confidential Information received from the other party with the same degree of care as it uses to protect its own Confidential Information, but in no event with less than a reasonable degree of care. Neither party will use or disclose the other party's Confidential Information, except as permitted in this Section or for the purpose of performing obligations under the Agreement. The confidentiality obligations of each party under the Agreement will survive any expiration or termination of the Agreement or of any order. Upon termination of the Agreement, each party will cease all use of the other party's Confidential Information (except for Software and Documentation in accordance with the applicable license granted under the Agreement) and will promptly return, or at the other party's request destroy, all Confidential Information in tangible form and all copies of Confidential Information in that party's possession or under its control, and will destroy all copies of Confidential Information on its computers, disks and other digital storage devices. Upon request, a party will certify in writing its compliance with this Section.

6. SOFTWARE LICENSE TERMS

6.1. License Grant

\*   \*   \*   \*   \*   \*

6.1.3. All Rights Reserved. Except for the limited license rights expressly granted in these Software License Terms, Avaya reserves all rights in and to the Software and Documentation and

any modifications thereto, including title, ownership, intellectual property rights, and any other rights and interests. Customer will own only the Hardware or physical media on which the Software and Documentation are stored, if any.

6.2. License Restrictions

6.2.1. General Restrictions. To the extent permissible under applicable law, Customer agrees not to: (i) decompile, disassemble, or reverse engineer the Software; (ii) modify or create any derivative works (including, without limitation, translations, transformations, adaptations or other recast or altered versions) based on the Software or Documentation, or alter the Software; . . . (vii) violate any obligations with regard to Avaya's Confidential Information; or (viii) permit or encourage any third party to do any of the foregoing. To the extent that Customer is expressly permitted by applicable mandatory law to undertake any of the activities listed in the preceding sentence, Customer will not exercise those rights until Customer has given Avaya twenty (20) days written notice of Customer's intent to exercise any such rights.

6.2.2. Backup Copies. Customer may create a reasonable number of archival backup copies of the Software and Documentation on the condition that and as long as Customer: (i) stores backup copies separately from any actively used computer programs; (ii) keeps a written record of all backup copies indicating the location of their storage; and (iii) provides such record to Avaya upon request. Customer will not remove any product identification, trademark, copyright or other proprietary rights notices from the Software or Documentation and will duplicate and display all names, logos and notices of Avaya and its licensors on each copy of the Software and Documentation made by Customer.

D–212, ¶ 3; D–34.

Later versions of that form agreement made minor changes and additions to the language and paragraph numbering, but they retained the substance of the just-quoted provisions. D–212, ¶ 3; D–228, ¶¶ 6–7; D–35, 36, 38, 39.

52. Avaya's maintenance code runs tests on the PBX system, including periodic background tests that run at all times without human intervention and check the health of the hardware of the system. Tr. 11/21/05 p.m. at 98:7–21; 99:21–100:18 (Scoville testimony). It also allows users to run "demand tests" by typing and entering certain "commands" into the PBX system. Tr. 11/21/05 p.m. at 98:7–21; 124:20–125:1; D–169 (Scoville testimony); Oct. 12, 2005 deposition of Wayne Dudones ("Dudones Dep.") at 53:7–54:24.

53. Maintenance Software Permissions ("MSPs") are permission codes that give access to, and allow the use of, portions of Avaya's maintenance software that facilitate the performance of many maintenance functions, but not all of the functions that can be performed using the full array of Avaya's maintenance software. P–149 ¶ 9; Tr. 11/8/05 a.m. at 63:3–7 (Schumacher testimony). Among other things, they enable an Avaya PBX owner to run a set of commands "on demand" to troubleshoot problems affecting a PBX's performance. D–169 at 2.

54. There are three types of MSPs: Processor and System MSPs, Station and Trunk MSPs and DS1 MSPs. Processor and System MSPs allow equipment owners to run demand tests on processor and system circuit packs. Station and Trunk MSPs allow equipment owners to run demand tests on station and trunk circuit packs. DS1 MSPs allow equipment owners to administer parameters on DS1 (T1) circuit packs, but they do not allow them to run tests. 11/21/05 p.m. at 100:22–101:9 (Scoville testimony); D–169 at 3.

55. Avaya PBXs are delivered to purchasers with MSPs "turned off." Malone Dep. at 154:18–25. MSPs have to be turned on or "activated" by Avaya to allow an equipment owner to run the set of maintenance commands permitted by MSPs. Malone Dep. at 26:25–28:3, 155:17–157:14; Dudones Dep. at 48:20–49:7, 56:15–57–7, 61:15–19. If MSPs are turned on equipment owners have permission, at least technologically, to run those commands. Dudones Dep. at 52:18–23. Conversely, if MSPs are not turned on an equipment owner is unable to execute those commands. Dudones Dep. at 56:15–18. Equipment owners may still run commands using the PBX's administration code that do not require MSPs to be turned on. P–234; Malone Dep. at 71:13–18.

56. To use MSPs an equipment owner selects a command to run, types the command into the PBX terminal and hits the "Enter" key on the terminal. That causes the maintenance software on the PBX to run the test specified by the command. Dudones Dep. at 53:7–54:24, 57:8–14, 61:20–62:1.

57. Avaya personnel and Avaya's Business Partners can access and use software on Avaya PBXs, including the maintenance software, through other "logins." Each of those logins requires a user name and a password, and each grants rights to execute various commands. Malone Dep. at 68:24–69:3, 69:25–70:9.

58. Avaya personnel can log into Avaya PBXs using logins known as CRAFT, INADS and INIT, which give them access to the maintenance software commands, including those commands that MSPs allow. Tr. 11/21/05 p.m. at 173:6–174:5 (Scoville testimony); Malone Dep. at 67:4–16. Those CRAFT, INADS and INIT logins are reserved for Avaya personnel only. Tr. 11/21/05 p.m. at 173:6–20 (Scoville testimony). Business Partners can log into Avaya PBXs using a login known as DADMIN, which allows them to access and execute maintenance commands. Tr. 11/21/05 p.m. at 174:15–20 (Scoville testimony). DADMIN logins are "PBX specific" in that a Business Partner needs a specific DADMIN login for each PBX. Tr. 11/21/05 p.m. at 175:13–20 (Scoville testimony).

### AT & T's Decision To Make Maintenance Software Permissions Available to Self–Maintainers

59. With the introduction of AT & T's first fully digital PBX system (System 75) in 1984, AT & T's on-site (Tier I) technicians used the CRAFT logins to access software in the equipment that could be used to perform maintenance functions. Certain equipment owners, principally universities and government entities, had technicians on their staff and wanted to take advantage of their embedded staffs to perform the maintenance that AT & T's Tier I technicians could perform with CRAFT logins. Tr. 11/07/05 p.m. at 160:7–163:25 (Peel testimony).

60. In response AT & T offered a license to those self-maintainers, giving them the right to use MSPs. MSPs gave those self-maintainers' technicians access to Avaya software that allowed them to perform virtually the same maintenance functions as an AT & T technician could perform with AT & T's CRAFT logins and that Avaya Business Partners could later perform with DADMINs. At the time MSPs were first made available, self-maintainers paid a one-time charge of $2,500 to $3,500 to license the MSPs for an individual PBX system at a particular site. In the early 1990s the self-maintainers' payments for MSP licenses were reset at a level representing an annual cost of approximately 30% of the cost of a standard maintenance agreement. Tr. 11/07/05 p.m. at 164:1–165:4 (Peel testimony).

*Maintenance Assist*

61.  Many managers responsible for the telecommunications operations of PBX equipment owners "have sought to complement their skills, information resources, and 'clout' through active participation in manufacturer User Groups." D–173 at 12. Prompted by the Self–Maintenance Committee of Lucent's PBX User Group, in 1996 Lucent developed an offering called "Maintenance Assist" for self-maintainers. That responded to the belief on the part of the self-maintainers in the Lucent User Group that the charge for MSPs—30% of the cost of a standard maintenance agreement—was excessive. Because the MSPs gave access to Lucent proprietary software that resulted from the company's investment in R & D, however, Lucent resisted lowering that charge. Instead Lucent introduced the Maintenance Assist offering, which made features available to self-maintainers in addition to MSPs, including direct access to Tier III technicians and discounted T & M visit charges. Tr. 11/07/05 p.m. at 158:24–160:4 & 165:23–168:20 (Peel testimony).

62.  During the period from 1996 to 2000 Lucent representatives had monthly meetings with the Self–Maintenance Committee of the Users Group and met with self-maintainers at four regional and one national meeting each year. During those meetings the self-maintainers complained that the Maintenance Assist offering was too complex, including its pricing elements, and could not be adequately explained by Avaya representatives. By the end of 1999 a revamped Maintenance Assist offering was made available. Tr. 11/07/05 p.m. at 168:24–172:23 (Peel testimony).

63.  That revised Maintenance Assist offering, made available in December 1999, included a single $.60 per port per month cost for MSPs, unlimited access to Lucent's customer support website, direct access to Tier III support and discounted T & M on-site visits. It also had optional features that were available to the self-maintainers. That $.60 per port per month cost was comparable to the cost of Maintenance Assist before December 1999. Tr. 11/07/05 p.m. at 169:25–173:13 (Peel testimony); D–75.

64.  Lucent issued an offer announcement dated December 6, 1999, describing the revamped Maintenance Assist offering. Its announcement went to Lucent sales people and others. Lucent did not promote the Maintenance Assist offer, but Lucent sales people were made aware of the offer in the event that an equipment purchaser or owner was a self-maintainer or expressed interest in self-maintenance. Tr. 11/07/05 p.m. at 177:22–179:19 (Peel testimony); D–75.

65.  After the formation of Avaya, Lucent's Maintenance Assist announcement was revised to reflect the name of the new company, but it did not change materially and continued to be used. Avaya's revised announcement made clear that the offering was for equipment owners that used their own personnel to maintain their Avaya PBXs:

> Maintenance ASSIST addresses the needs of self-maintenance customers who choose to take total responsibility for their networks. The primary motivators for these customers are fast response times, increased control of assets, and better utilization of their embedded staffs.

It also contained a recommendation "that customers who are not experienced in maintaining their switch initially purchase training options" made available by the offering. Through the "Self–Maintenance Cost–Justification Model Basic Factors" included with the announcement, Avaya expressly advised an equipment owner to account for the cost of an in-house technician's salary and benefits when making the

decision whether or not self-maintenance was cost-effective. D–75 at AVAUC 00053323, 53325, 53329; Tr. 11/07/05 p.m. at 174:16–183:1 (Peel testimony); Tr. 11/08/05 a.m. at 66:17–67:22 (Schumacher testimony).

66. In addition, the Maintenance Assist announcement expressly stated that the "offer can be sold to Avaya Communication end-user customers only and is not available to third-party maintainers." D–75 at AVAUAC 00053327. Peel, the Lucent manager responsible for maintenance offers including Maintenance Assist from 1996 through September 2000, was not aware that any Maintenance Assist customers had made MSPs available to third-party maintenance providers during that time period. Tr. 11/07/05 p.m. at 183:2–11.

67. In addition to the information already described, the Maintenance Assist announcement contained "Competitive Information" detailing and discussing the self-maintenance programs offered by Avaya's competitors Nortel, Norstan and Rolm. Avaya concluded that its Maintenance Assist offering aligned with its competitors' offerings to self-maintainers. D–75 at AVAUAC 00053333–35.

68. In February 2003 the Maintenance Assist offering announcement was revised but its elements appeared to be unchanged. That announcement reiterated that the "offer can be sold to Avaya end-user customers only and is not available to third-party maintainers." Specifically with respect to MSPs, the February 2003 announcement stated that these logins "are offered as a 'right to use' (RTU) feature only and are Avaya's intellectual property. Customers are entitled to use them only as long as they maintain an Avaya Service Agreement." P–13 at 7.

69. Because the February 2003 Maintenance Assist announcement made no material change in the offering, the offering remained essentially unchanged until

around April 2005. Tr. 11/08/05 p.m. at 78:18–24 (Schumacher testimony); P–49 at ROI 000023.

70. Avaya's Maintenance Assist agreements have 12-month terms. Tr. 11/08/05 a.m. at 55:4–7 (Schumacher testimony). They renew automatically unless either party provides notice of its intent to terminate the agreement at least 30 days before the end of the term. Sept. 27, 2005 deposition of Jerry Peel ("Peel Dep.") at 144:20–145:25; P–198 at UAC 90732.

71. Fewer than 100 Lucent PBX owners had Maintenance Assist agreements at the time Lucent spun off Avaya. Tr. 11/07/05 p.m. at 180:2–6 (Peel testimony). Presently approximately 270 Avaya PBX owners (out of some 20,000 owners—see Finding 40) have Maintenance Assist agreements. Tr. 11/08/05 a.m. at 50:9–18 (Schumacher testimony).

72. In FY 2003 Avaya's revenues from Maintenance Assist agreements were approximately $3 million. In FY 2005 the revenues from Maintenance Assist agreements had risen to $6.3 million. Tr. 11/08/05 p.m. at 15:9–21 (Schumacher testimony).

### Access to Avaya Maintenance Software

73. As reflected in the preceding Findings, Avaya PBX equipment owners can obtain licenses to use MSPs to gain access to certain Avaya maintenance software if they enter into a Maintenance Assist agreement. Avaya will also license the right to use MSPs to PBX owners that have standard maintenance contracts with Avaya or that have PBXs under warranty and a pending maintenance contract with Avaya. D–78 at AVAUAC 56277–78; Tr. 11/08/05 a.m. at 53:18–56:4 (Schumacher testimony). Some PBX owners with Avaya maintenance contracts license the right to use MSPs, while others do not. For example, most of UAC's clients that own Avaya PBXs appear not to have licensed

the right to use MSPs when they had maintenance contracts with Avaya. Martucci Dep. at 44:6–45:23, 125:10–12 (as of June 1, 2005 80% of UAC clients were Avaya equipment owners); Finding 9 (as of June 2005 UAC provided maintenance coverage for approximately 900 clients); Finding 98 (as of July 1, 2005 only about 65 UAC clients had Maintenance Assist agreements and, therefore, MSP licenses); Finding 146 (UAC sent its August 30, 2005 letter to approximately 380 "non-MSP clients"). (COCO)

74. Owners of Avaya PBXs can also obtain the right to use MSPs from Avaya through Avaya Business Partners in two ways. First, a Business Partner can sell an Avaya Maintenance Assist agreement to a PBX owner for a commission. Second, a Business Partner can purchase a level of Avaya support for its own maintenance contract with an equipment owner that allows the owner to license MSPs directly from Avaya. Tr. 11/09/05 a.m. at 22:22–23:9; 67:23–68:5 (Schumacher testimony). Like equipment owners that deal directly with Avaya, Avaya PBX owners that deal with Business Partners must therefore have a maintenance contract or a Maintenance Assist agreement to have the right to use MSPs.

75. Business Partners obtain access to Avaya's maintenance software through log-ins called DADMINs. DADMINs are available only to authorized Avaya Business Partners. To obtain a DADMIN from Avaya, a Business Partner must submit a request form for the equipment owner and PBX location. D–78; Tr. 11/08/05 a.m. at 58:20–59:10 (Schumacher testimony).

76. MSPs, DADMIN logins and CRAFT logins all give access to software that allows the technician to execute similar maintenance commands. D–78 at AVAUAC 00056279; Tr. 11/09/05 a.m. at 24:17–25:11 (Schumacher testimony); Tr.

11/08/05 p.m. at 53:25–54:11 (Schumacher testimony); Tr. 10/26/05 p.m. at 61:11–62:6 (Dudones testimony).

### Licensing Avaya Maintenance Software

77. Lucent and Avaya have used a variety of form agreements that govern the licensing and use of software embedded in their PBX equipment, including the software that MSPs permit a customer to use. Those documents generally included certain "basic" or "master" agreements, attachments, supplements and addenda. D–212 ¶¶ 3, 8; D–228 ¶¶ 6–7. Among the addenda were certain "MSP Addenda" that specifically addressed the terms under which MSPs were provided to PBX owners. Id.; D–51 to 57, 59, 60, 72 to 74; P–221. Finally, they included documents known as Service Offerings and Support Plans ("SOSP") and Service Agreement Supplements ("SAS"). D–228 ¶¶ 3–5; D–229 ¶¶ 2–4; P–211, 212; D–61, 62, 66, 213 to 218, 220 to 227.

78. All the forms of agreement that Lucent and Avaya used, including the "general" master agreements and those specific to MSPs, contained limitations and restrictions on an equipment owner's right to use the companies' software. From June 1996 through June 2003, the form master agreement ("Purchase/Service Agreement") that Lucent and Avaya customarily used with their equipment owners granted "a personal, non-transferable and non-exclusive right to use, in object code form, all software and related documentation furnished under this Agreement." D–212 ¶ 8(a); D–63, 64, 65. Beginning in March 2003 Avaya used a new form master agreement that granted "[c]ustomer a non-sublicenseable, non-exclusive, non-transferable license to use Software and Documentation provided under the Agreement." D–212 ¶ 3; D–228 ¶ 6; D–34 to 36, 38, 39.

79. In addition, a variety of addenda that specifically addressed MSPs and that Lucent and Avaya grouped with the master agreements to form completed agreements with equipment owners all granted the owners "a personal, non-transferable and non-exclusive right to use ... the Lucent [or Avaya] Software Permissions to Maintain [Stations and Trunks and/or Processor and System]." D–212 ¶¶ 3, 8(b); D–228 ¶¶ 6–7; D–51 to 57, 59, 60. Another set of form MSP Addenda that Avaya grouped with the master agreements granted Avaya owners "a personal, non-transferable and non-exclusive license to use the following end user Maintenance Software Permission tools to maintain: (1) Stations and Trunks, and (2) Processor and System (collectively known as Maintenance Software Permissions or "MSPs")." D–212 ¶ 3, 8(b); P–221, D–72, 73, 74.

80. In addition to granting limited personal and/or non-transferable rights to use software and MSPs, the various forms of agreement that equipment owners entered into with Lucent and Avaya imposed further restrictions upon those rights. Among other things, those forms provided (a) that an owner was required to execute an Avaya software permissions addendum in order to establish MSPs (D–228 ¶ 3; D–229 ¶ 3; D–61, 62, 66; 214, 215, 216, 218, 220, 222, 223, 224), (b) that an owner could not access and take control of logins that were reserved for Avaya personnel MSPs, (*id.*), and (c) that an owner was required to "return" or to allow Avaya to "deactivate" MSPs immediately upon the termination of the owner's Avaya Service Agreement (D–212 ¶ 3; D–229 ¶ 3; P–211, 212, 221, D–28, 57, 59, 60, 61, 62, 66, 74, 214, 215, 216, 218, 220, 221, 224).

81. Moreover, SOSP and SAS documents released by Lucent and Avaya specifically provided that MSPs are not transferable or assignable to a service provider or any third party. D–228 ¶¶ 3–5; D–229

¶¶ 2–4; P–211, 212; D–61, 62, 66, 214, 215, 216, 218, 220, 221, 223 and 224.

82. Avaya's policy was to include a copy of the applicable SOSP in an agreement package that was provided to an equipment owner. End user customers were generally, but not always, provided with copies of the SOSP documents applicable to their contracts at various points in the relationship with Avaya. D–228 ¶ 4. SOSP documents (D–66, 213, 217, 222, 225, 226, 227) are incorporated by reference into each of the three form Purchase/Service Agreements used by Lucent and Avaya. D–63 ¶ 2(C); D–64 ¶ 1(C) and D–65 ¶ 2(C).

83. Avaya made the SAS documents available to PBX owners upon request and sometimes used them as sales tools. D–229 ¶ 4. Avaya's "master" agreement forms that it began using in March 2003 ("Master Purchase/Service Agreement (United States)" and "Customer Agreement (United States)") contained language that referred to the terms of the SAS documents (P–211, 212; D61, 62, 214, 215, 216, 218, 220, 221, 224) that Avaya issued. See, e.g., D–36 Attachment D "MAINTENANCE SERVICES TERMS" ¶¶ 1, 2 and 4; see also D–34, 35, 38, 39.

84. In sum, only Avaya licenses the right to use MSPs, and it only licenses that to an owner of an Avaya PBX. Tr. 11/08/05 a.m. at 57:24–58:6 (Schumacher testimony); Tr. 11/08/05 p.m. at 45:23–48:10 (Schumacher testimony). Avaya deems MSPs to be its intellectual property and "RTU [right-to-use] software and as such are licensed to the customers to use as such." D–78 at AVAUAC 00056278, 00056280.

85. At least since 1996 the MSP licenses have expressly provided that the right to use is "personal" to the equipment owner and "non-transferable" by the equipment owner. Each equipment owner's right to use the MSPs expires at the end

of the owner's maintenance contract or Maintenance Assist agreement. D–228 ¶ 6, D–212 ¶ 3, D–51, D–52, D–53, D–54, D–55, D–56, D–57, D–60, D–59, D–74, P–221 (exhibits listed chronologically by document date).

86. Avaya limits the right to use MSPs to PBX equipment owners that self-maintain because the login allows access to Avaya maintenance software assets that Avaya believes give itself and Business Partners, who use CRAFT and DADMIN logins to gain similar access, competitive advantages in the sale of equipment and maintenance. Tr. 11/08/05 a.m. at 63:8–19 (Schumacher testimony); Tr. 11/08/05 p.m. at 62:22–63:4 (Schumacher testimony).

87. Avaya has never granted the right to use MSPs to unauthorized third-parties. Tr. 11/08/05 p.m. at 77:18–22 (Schumacher testimony). Martucci himself acknowledged that he doesn't "think that Avaya ever supported UAC using a client's MSPs" or that it is in Avaya's interest to do so. Tr. 10/25/05 p.m. at 11:10–16. In addition he testified that "UAC did not buy Maintenance Assist contracts [,] ... never asked Avaya to buy a Maintenance [Assist] contract[, a]nd ... suspect[ed Avaya] wouldn't sell one to [UAC]." Tr. 10/25/05 p.m. at 54:2–10.

### Avaya Business Partners

88. Avaya has approximately 300 Business Partners who are authorized to sell PBXs and maintenance services for PBXs. Tr. 11/9/05 p.m. at 110:21–112:12 (Schumacher testimony). Approximately three-fourths of those Business Partners provide maintenance services for Avaya PBXs. Sept. 28, 2005 deposition of Linda Schumacher ("Schumacher Dep.") at 307:13–20.

89. Avaya and its Business Partners compete for the provision of maintenance to some Avaya PBX owners and jointly provide maintenance to other owners. Avaya also supports Business Partners in providing maintenance to some owners

that have contracts with Business Partners. Tr. 11/08/05 p.m. at 13:15–14:21 (Schumacher testimony).

90. Avaya and its Business Partners agree not to solicit each other's existing maintenance customers. If an owner issues an RFP for the maintenance of Avaya PBX equipment, however, Avaya and Business Partners may offer competing maintenance proposals to the owner. Tr. 11/09/05 p.m. at 95:12–103:8 (Schumacher testimony); P–7; P–11; P–228; D–69.

91. Business Partners also agree not to interfere with, or assist a third-party that interferes with, an Avaya maintenance contract. P–7 at DAYCOM 00024.

92. Avaya's "Multi–Channel Policy on Access to Maintenance Capabilities (including MSPs and Avaya Logins)," issued October 7, 2002 and distributed to Avaya's sales force and Business Partners, provides that "[n]o Business Partner will be allowed access to DADMIN if the Business Partner supports a third party that is known to interfere with Avaya Service Agreement contracts." That document also notified Business Partners that Avaya would not provide logins to any Business Partner that "unhooks" an Avaya maintenance contract or "is involved as a conduit for service delivery for any third party that unhooks" an Avaya maintenance contract. Thus Business Partners agree not to interfere with Avaya's relationships with equipment owners that have Avaya maintenance contracts and not to assist a third-party, such as UAC, that interferes with Avaya's maintenance relationships. D–78 at AVAUAC 00056279; Tr. 11/08/05 a.m. at 56:5–61:9 (Schumacher testimony); Tr. 11/09/05 p.m. at 105:11–108:7 (Schumacher testimony).

93. Avaya Business Partners compete to provide their own maintenance contracts to owners of Avaya equipment. Business Partners can and do compete

successfully against Avaya and other third party maintenance vendors. For example Daycom, an authorized Avaya Business Partner, repeatedly beat Avaya and other competing maintenance vendors to win first a one-year and then a two-year maintenance contract with Wal–Mart. Daycom also competed successfully against "as many as five or six different companies," including Avaya, to win a two-year maintenance contract with Mutual of Omaha. Sept. 29, 2005 deposition of Richard Day ("Day Dep.") at 94:19–96:22.

### UAC's Strategy To Obtain Owners of Avaya PBX Equipment As Clients

94. Until July 1, 2005 UAC's business strategy was to solicit PBX equipment owners, principally those with maintenance contracts with Avaya, to convert to contracts with UAC to provide T & M service, provided not by UAC itself (it had no personnel capable of providing maintenance) but by Avaya or an Avaya Business Partner. D–83 at UAC 00008. Martucci testified that "100 percent of [UAC's] clients … once had an Avaya Maintenance agreement," (Tr. 10/25/05 p.m. at 16:4–18:15) and that each UAC client who owns Avaya PBX equipment "chose to terminate its agreement with Avaya (in accordance with its termination provisions) in order to enter into its current maintenance agreement with UAC instead." D–162; Martucci Dep. at 111:4–114:8. UAC paid termination charges for some equipment owners that terminated Avaya maintenance contracts early. Tr. 10/25/05 p.m. at 59:12–25 (Martucci testimony). (COCO)

95. UAC told prospective clients that they could terminate their Avaya maintenance contracts and still get Avaya maintenance service for their PBXs. Tr. 10/26/05 a.m. at 55:20–24 (Martucci testimony); Martucci Dep. at 87:15–20. (COCO)

96. Maintenance contracts that UAC offered to Avaya PBX owners cost less than those equipment owners' maintenance contracts with Avaya. UAC represents that it offers a maintenance contract "that typically reduces [an owner's] current maintenance costs by as much as 15% to 20%." D–83 at UAC 00008; Tr. 10/25/05 p.m. at 29:2–30:1 (Martucci testimony). But UAC's maintenance contract does not of course provide Avaya's remote monitoring and resolution service, including EXPERT Systems or guaranteed response times among other things (see Finding 37).

### UAC's Methods for Providing Maintenance to Clients with Avaya PBX Equipment

97. Before July 1, 2005 95% of the service visits relating to Avaya PBXs made to UAC clients were made by Avaya or Avaya Business Partners. Tr. 10/28/05 a.m. at 28:4–14 (Lochner testimony). Martucci testified that "in every case when UAC has a contract, the people who are doing the work at the end-user level are in fact those same authorized dealers or Avaya" (Tr. 10/25/05 p.m. at 44:13–20) and that UAC's "competency was to be able to deliver an Avaya solution" (Tr. 10/25/05 p.m. at 96:6–23). In short, Avaya or Avaya Business Partners provided most, if not all, of the maintenance service for UAC clients until July 1, 2005.

98. As of July 1, 2005 approximately 65 UAC clients had Maintenance Assist agreements with Avaya. Tr. 10/26/05 a.m. at 46:10–49:5 (Martucci testimony); D–170; D–171. But most UAC clients with Avaya PBXs did not have such Maintenance Assist agreements with Avaya. Tr. 10/26/05 a.m. at 49:18–25 (Martucci testimony). UAC paid the costs of the Maintenance Assist agreements for many, if not all, of its clients that had such agreements. Tr. 10/26/05 a.m. at 50:1–8 (Martucci testimony).

99. UAC has no license from Avaya to use MSPs. Tr. 10/26/05 a.m. at 50:12–14 (Martucci testimony). Martucci testified,

though, that it was "[p]artially correct" that UAC remotely performed PBX maintenance using Avaya MSPs. He stated that "over the last couple of years from time [to time] our own technicians will dial in and perform some remote diagnostics with MSPs." Tr. 10/26/05 a.m. at 44:1–13.

100. Paul Ambre ("Ambre"), a technical service specialist at UAC, has testified that he first started remotely troubleshooting Avaya PBXs owned by UAC clients in "late 2002, early 2003" and that no one at UAC did such remote troubleshooting before he did. Oct. 14, 2005 deposition of Ambre ("Ambre Dep.") at 7:1–12 & 27:24–29:10. Gorski, an RR Donnelley representative who worked for Moore North America before its acquisition by RR Donnelley, stated that UAC first asked for Moore's MSPs apparently no earlier than 2003 when UAC started to hire some technicians. Gorski Dep. at 79:4–80:13; 97:7–98:1. In January 2004 UAC hired Dudones as senior telecommunications engineer because of his experience in accessing and using Avaya's PBX maintenance software remotely. Tr. 10/26/05 p.m. at 32:10–13 & 73:1–23 (Dudones testimony). Most of Dudones' work for UAC has been to repair PBXs remotely, a process that includes the use of the software to which MSPs give access. Tr. 10/26/05 p.m. at 72:6–25 (Dudones testimony).

### UAC's Lack of Relationship with Avaya

101. UAC has never had any contractual relationship with Avaya that permitted UAC to use MSPs to access Avaya's maintenance software (see Finding 87). Nor has UAC ever had any agreement with Avaya that obligated Avaya to provide T & M service to UAC clients. Tr. 10/26/05 a.m. at 55:25–56:2 (Martucci testimony).

102. Until July 1, 2005 UAC's business strategy to shift Avaya equipment owners from Avaya maintenance contracts to contracts with UAC, which would result in the owners receiving Avaya or Avaya Business Partners' T & M service instead, included "unhooking" Avaya maintenance contracts before the end of their terms (Findings 94 and 95).

103. As a result of concerns raised by Avaya in 2000, UAC specifically did not use the name "Avaya" to advertise or to promote UAC. Tr. 10/26/05 p.m. at 26:1–27:8 (Martucci testimony); see Finding 106.

104. On at least three occasions UAC discussed possible business relationships with Lucent and Avaya. On each occasion Lucent or Avaya declined to enter any business relationship with UAC. Findings 105 to 107.

105. In 1997 or 1998 Martucci called Peel to discuss a partnering relationship between UAC and Lucent. Martucci testified that he initially called Peel to discuss "establishing a volume rate for time-and-material service or examining other ways [UAC and Avaya] can work together cooperatively." Avaya had no interest. Tr. 11/07/05 p.m. at 183:24–184:23 (Peel testimony); Martucci Dep. at 32:21–35:1. (COCO)

106. Martucci also testified that in 2000 Lucent expressed concern that UAC "was misrepresenting that [it had] a relationship with Avaya." He said that he "assured [Avaya] that [UAC did not have any relationship with Avaya], and communicated to [Avaya's] satisfaction . . . that [UAC made] clear to prospects that [it did not]." Martucci stated that "Avaya did not like being on the list of vendors someone may choose" and further testified that letters back and forth between UAC and Avaya at that time did not result in an agreement. Martucci Dep. at 146:21–150:21. (COCO)

107. Martucci testified that Avaya inquired about acquiring maintenance contracts from UAC in March 2005 and that

he then discussed with Avaya the purchase by UAC "in big bulks, large blocks of service time or have some other positive effect of formally working together with Avaya and trying to work cooperatively." But he confirmed that his entreaty "just was met with no acceptance." Martucci said he also inquired to no avail about "some ways of UAC ... having a product offering from Avaya" relating to MSPs. Martucci Dep. at 150:22–153:16; Tr. 10/25/05 p.m. at 67:21–69:15; Tr. 10/26/05 a.m. at 44:25–45:17 & 46:6–9. (COCO)

### Maintenance Considerations of PBX Purchasers at Point of Equipment Sale

108. UAC does not dispute that most purchasers of Avaya PBX equipment enter into their first post-warranty maintenance contract with Avaya. Finding 31; D–173 at 14–15; D–75 at AVAUAC 00053323. Based on UAC's allegations in this case, most Avaya PBX purchasers first select options for maintaining their equipment that are at higher cost than the maintenance contracts offered by UAC at some time after the equipment purchases. Finding 96.

109. As stated in Finding 33, approximately 24% of PBX equipment purchasers do not have maintenance contracts with Avaya. Those purchasers select among several of what they appear to believe are lower cost options including T & M services solely, self-maintenance, or maintenance contracts with authorized or unauthorized service providers. Id.; D–173 at 14–15. There is no record evidence that UAC's subsequently offered maintenance contracts are lower cost than any of these options.

110. There is also no record evidence that any PBX purchaser considered entering its initial post-warranty maintenance agreement with UAC at the point of equipment sale. Nor is there any record evidence that any PBX purchaser considered at the point of equipment sale the possibility that it would enter into a maintenance contract with UAC at some future date after termination of its initial post-warranty maintenance contract with Avaya or any other maintenance provider. There is no support for Stiroh's assertion that PBX purchasers regard UAC as a maintenance option at the time they make their equipment purchases—the point of time that Stiroh concedes is at issue in this case. Tr. 10/28/05 p.m. at 167:7–14.

111. There is no record evidence that the maintenance offerings of UAC or any unauthorized service provider affected the prices that Avaya or any other equipment provider charged for PBXs or the prices that Avaya or any other service provider offered for maintenance contracts at the point of equipment sale.

112. Martucci testified that he did not know what PBX equipment purchasers learned at the time of their purchases about equipment and maintenance options and the costs of these options from the variety of available sources, including competing PBX equipment providers. Tr. 10/26/05 a.m. at 52:25–54:18.

113. Kocay of Retirement System Group ("RSG"), one of two Avaya PBX owners and UAC clients that UAC has deposed, testified that RSG purchased its PBX in 1988 and had maintenance contracts first with AT & T and Lucent until 1998, when it entered into a maintenance contract with UAC. Kocay Dep. at 28:2–16, 33:6–11 & 37:10–15. RSG upgraded its PBX in 2004 at a cost of approximately $23,000, acquiring the upgrade from an Avaya Business Partner. Kocay Dep. at 42:23–43:5, 45:19–22 & 89:8–90:12. At the time of its PBX upgrade, RSG's maintenance contract with UAC cost approximately $9,800 annually. On September 16, 2005 RSG received four alternative proposals from an Avaya Business Partner for one-year maintenance agreements at year-

ly costs of $7,712, $8,760, $9,132, and $10,241 (Kocay Dep. at 91:17–93:11; D–146), so that three of the four maintenance contract options offered to RSG by an Avaya Business Partner were lower cost than RSG's maintenance contract with UAC, and the fourth was higher by a little more than $400.

### Maintenance Considerations of PBX Equipment Owners After Point of Sale

114. From the evidence, a relatively small number of PBX owners abandoned maintenance contracts with equipment sellers or other authorized service providers for maintenance contracts with unauthorized service providers. For example, UAC's clients numbered approximately 900 prior to June 13, 2005 and remained the same from 2003 to 2005. Finding 9. UAC's revenues declined approximately 12% from 2003 to 2004. Finding 13.

115. All UAC clients with Avaya PBXs knew that their maintenance contracts with UAC replaced their maintenance contracts with Avaya. Findings 94–95. Those PBX owners also plainly knew that maintenance contracts were an important part of Avaya's business. Findings 18, 25, 31, 39. Martucci testified that equipment providers "[s]ell the PBX at any price including at cost just to get the Maintenance Agreement . . . to try to recapture the margin they didn't get on the equipment sale." Finding 34.

116. There is no record evidence that UAC informs prospective clients that own Avaya PBXs that it requires, or even uses, MSPs to provide remote maintenance to its customers. In that respect the evidence establishes that UAC did not begin using MSPs to provide remote maintenance to any client before late 2002 at the earliest. Findings 99–100. Because approximately 65 UAC clients owning Avaya PBXs had Maintenance Assist agreements (Finding 98), it appears that UAC did not use MSPs to provide remote maintenance to many of its clients.

117. In response to the RFP for maintenance of Avaya PBXs issued by the second UAC client deposed by UAC, RR Donnelley, Avaya expressly informed RR Donnelley in 2004:

> MSPs are intellectual property of Avaya, and you are entitled to use them only as long as you are under warranty and have purchased a Service Agreement at point-of-sale, or maintain an Avaya Global Services Maintenance Agreement. Avaya will require the return of all Right–to–Use MSPs prior to termination of your maintenance agreement. MSPs are not transferable or assignable to a service provider or any third party. All access to proprietary software, activation of features without approval from Avaya and not accompanied by appropriate charges and/or Right–to–Use (RTU) fees is unauthorized and prohibited. Avaya requires that you agree to immediately return all MSPs upon warranty expiration or prior termination of your Service Agreement.

Avaya also informed RR Donnelley that no service provider other than Avaya could offer MSPs. D–178 at RRD 000662–63; D–179 at page 2 of attachment. (COCO)

118. Although UAC represented to prospective clients such as RR Donnelley that it could comply with their requirements that any maintenance provider for Avaya PBX equipment be able to supply MSPs, Avaya never gave UAC or any other unauthorized service provider access to Avaya's maintenance software through MSPs or any other login. Finding 87; D–178 at RRD000662–63. (COCO)

119. Martucci testified that all UAC clients that owned Avaya PBXs were told that UAC had no agreement with Avaya to provide service to them. Tr. 10/26/05 a.m. at 55:25–56:10. Hence the evidence shows

that UAC clients, all of whom had abandoned Avaya maintenance contracts for UAC maintenance contracts, knew that Avaya had no duty to provide MSPs or T & M service to them after they entered into contracts with UAC. Accordingly they must have reasonably anticipated that Avaya might at some point take steps to prevent the use of MSPs by unauthorized service providers and decline to continue to provide T & M service that supported UAC maintenance contracts.

120. In that respect Martucci made clear that UAC believed it was under no obligation to renew UAC maintenance contracts with any clients if it deemed the contracts to be insufficiently profitable. Finding 16. By the same token, UAC clients also should have reasonably anticipated that UAC's commitment to its maintenance contracts with them extended no longer than the end of the terms of those agreements.

### UAC's Transaction with NextiraOne

121. On June 14, 2005 UAC "announced a major expansion as a result of a multi-year joint services agreement with NextiraOne which includes the acquisition of a portion of NextiraOne's enterprise voice maintenance business." UAC stated that the acquisition of that maintenance business made UAC "the largest third-party [provider] of its kind" and that the agreement itself was "a milestone because it is the first time that a major national communications service provider is providing services under the UAC umbrella as its core break/fix service strategy." P–260.

122. UAC added approximately 8,000 new maintenance customers as a result of its acquisition of the NextiraOne maintenance business. Tr. 10/26/05 p.m. at 15:2–5 (Martucci testimony). It said it also intended to add 300 employees, including 200 technicians, as well as 100 vans. P–260.

123. At the hearing Martucci described NextiraOne as "a distributor primarily for Nortel, selling and installing Nortel brand PBXs," and as "one of the largest Nortel maintenance providers in the United States." Tr. 10/25/05 p.m. at 89:21–90:8. Nortel and NextiraOne are primary equipment and maintenance competitors of Avaya. Findings 21, 32.

124. Martucci testified that the value of the NextiraOne transaction to UAC was "very much ... [the] ability to get further penetration into [the former NextiraOne] accounts by taking over the maintenance contracts of Avaya equipment, which might be maintained by Avaya direct or their business partner." He used as an example in that regard Wells Fargo, a NextiraOne client acquired by UAC that had 17 facilities with Avaya PBXs. Tr. 10/25/05 p.m. at 90:20–91:17. Martucci testified on direct that UAC's "sales process is very well tuned" and that Sean Pendergast ("Pendergast") "is able to give [UAC]—and certainly give to [him]—some very accurate projections of what [UAC] would expect to penetrate in this Nortel base. And that factored into what [UAC] paid for the NextiraOne maintenance." Tr. 10/25/05 p.m. at 96:6–23. On cross-examination Martucci said that Pendergast prepared "a loose list of likely candidates" among the 8000 former NextiraOne clients, or a "back of an envelope" list of "candidates," that had Avaya PBX equipment. Tr. 10/26/05 p.m. at 15:22–16:16. Pendergast testified that one of the benefits of the NextiraOne transaction is UAC's new ability "to go to that customer base that we brought over ... and potentially sell our services on other equipment types to those clients as well, equipment such as Avaya and others." Tr. 10/26/05 p.m. at 85:2–17. He also testified that UAC had been planning to increase its sales force by about 40 by year end. Tr. 10/26/05 p.m. at 87:22–88:7. William Fitz-

simmons ("Fitzsimmons"), one of UAC's opinion witnesses, expressly relied on UAC's intention to replace the Avaya maintenance contracts held the former NextiraOne (now UAC) clients in forming his opinions. Tr. 11/07/05 p.m. at 138:23–140:9.

125. Martucci testified that he did not believe that UAC would be able to obtain maintenance contracts for Avaya PBXs owned by former NextiraOne clients without access to Avaya MSPs or Avaya T & M service. Tr. 10/26/05 p.m. at 15:17–21.

126. At his deposition Martucci testified that NextiraOne has access to UAC's "entire" legacy client base to sell Nortel PBXs as a result of its agreement with UAC. Martucci Dep. at 159:9–24. But Martucci testified at the hearing that such opportunity for NextiraOne was limited only to existing Nortel equipment owners in UAC's legacy client base and to NextiraOne's former clients. Tr. 10/26/05 p.m. at 10:9–15:1. While the record does not contain sufficient evidence to establish which of Martucci's characterizations of the relationship between NextiraOne and UAC in that one respect is more accurate, it is undeniable that UAC—which now has 200 technicians trained to maintain Nortel PBXs—now has a greater incentive to encourage its clients to replace Avaya PBXs with new Nortel PBXs (rather than new Avaya PBXs) than it had before June 13, 2005. (COCO)

127. Martucci testified that UAC did not consider what Avaya's reaction would be to the UAC/NextiraOne transaction. Tr. 10/26/05 p.m. at 16:17–23 & 17:6–15.

### Avaya's July 1, 2005 Decisions

128. On July 1, 2005 Avaya issued a service bulletin titled "Avaya Global Services Policy Change for Support to Unauthorized Service Providers and their Customers—US Only." Its first paragraph described Avaya's broad business strategy with respect to maintenance of PBXs that prompted it to take the steps subsequently detailed in the bulletin:

> Avaya Global Services (AGS) services strategy is to provide world class service to Avaya maintenance agreement customers and authorized Partners through maintenance support agreements. Therefore, we are committed to focusing our resources, tools and support capabilities for these customer sets to ensure the highest level of quality and responsiveness.

P–288.

129. Two of the steps that Avaya announced it was taking addressed the availability of Maintenance Assist agreements, and thus access to MSPs, and the availability of Avaya T & M services to Avaya PBX owners who are clients of unauthorized service providers like UAC. Avaya decided not to enter into new Maintenance Assist agreements with these equipment owners or to renew Maintenance Assist agreements that those owners had with Avaya when the one-year terms of the agreements ended. Avaya also decided that it would no longer provide T & M services to PBX owners who used unauthorized service providers. P–288; see Finding 70 as to the 30–day notice required to terminate Maintenance Assist agreements.

130. It appears that those two steps, in combination, prompted UAC to file this lawsuit. When asked "which group of UAC customers needs to have an Avaya MSP or Maintenance [Assist] Agreement," Martucci answered:

> That's a complicated answer. If Avaya was going to provide T & M support as [it has] over the last eight years, some subset of customers would need MSPs, because they want to use it for their own use.

\*   \*   \*   \*   \*   \*

If Avaya said, "I am not going to be a provider of T & M services to any UAC client, then they all need MSPs, because that's the only ability for anybody other than Avaya to do the maintenance without Avaya's permission."

Tr. 10/25/05 p.m. at 53:16–54:1.

131. While Avaya did not regard an equipment owner's switch from an Avaya maintenance contract to Avaya T & M as advantageous for its future business prospects (Finding 39), it nonetheless provided T & M service to the equipment owner and, until July 1, 2005, did so even when the equipment owner entered into a maintenance contract with an unauthorized service provider, such as UAC. Avaya did that because it "didn't want to alienate the customer, and wanted to keep some kind of relationship even though it was not a very strong one." Tr. 11/08/05 p.m. at 2:25–3:21 (Schumacher testimony).

132. Avaya's decisions about which UAC complains evolved from discussions at Avaya that started about a year-and-a-half ago—in mid–2004. At that time Avaya began an evaluation of its maintenance offerings, including its MSP and T & M policies. Its discussions initially addressed T & M—"who was buying T & M, why were they buying T & M, and should [Avaya] continue to provide T & M at all." There was some discussion in that connection that "T & M actually devalued [Avaya's] maintenance contracts." Tr. 11/08/05 p.m. at 5:21–6:22 (Schumacher testimony).

133. At the time those discussions began, UAC was still regarded by Avaya as a service referral company or an insurer that competed for equipment maintenance dollars by converting PBX owners with Avaya maintenance contracts to T & M customers. Tr. 11/09/05 a.m. at 51:17–52:17 (Schumacher testimony); P–49; P–328; P–333. But in 2004:

[Avaya] saw a change in the way some of [its] competition was going to market. . . . [S]pecifically, unauthorized service providers were changing their go to market model.

\*     \*     \*     \*     \*     \*

something had changed in their value proposition or how they were presenting themselves.

\*     \*     \*     \*     \*     \*

There was a change because they were going after larger customers, more sophisticated customers, and there was something about a remote monitoring—something had changed . . . .

\*     \*     \*     \*     \*     \*

actually alarm management and then doing more than just referring service to somebody that could actually provide it, referring it back to Avaya or another Business Partner.

Tr. 11/08/05 p.m. at 8:13–9:19 (Schumacher testimony); P–49. At that time Avaya suspected that unauthorized service providers were gaining access to MSPs through their clients who owned Avaya PBXs. Tr. 11/09/05 a.m. at 50:24–51:7 (Schumacher testimony).

134. As the evidence shows, Avaya's "suspicion" was not baseless. Martucci's testimony that UAC has been using MSPs to provide maintenance remotely "over the last couple of years," Ambre's testimony that UAC used MSPs remotely no earlier than late 2002 and the testimony of the RR Donnelley representative indicating that UAC first asked for MSPs no earlier than 2003 all attest to the timeliness of Avaya's "suspicions." Findings 99–100. Moreover, the fact that UAC abandoned its no-growth mode in early 2004 and swelled its sales force by 50 plainly suggests that UAC's sales tactics, or "value proposition," gained increased visibility in 2004, enough that Avaya might have noticed. Findings 12–13; Tr. 11/08/05 p.m. at 80:14–82:10 (Schumacher testimony).

135. By 2005 Avaya had been experiencing some "erosion" of its maintenance business "over the last several years." Tr. 11/09/05 a.m. at 47:11–15 (Schumacher testimony). Avaya identified several reasons for that "erosion," including competition from UAC, a former Avaya Business Partner (TLI) and Avaya's own Business Partners. P–84 at AVAUAC 00026013–14; Tr. 11/09/05 a.m. at 55:20–58:23 (Schumacher testimony).

136. Effective in April 2005, shortly before the July 1, 2005 decisions that prompted this lawsuit, Avaya modified its Maintenance Assist offering to discourage Avaya PBX owners from using unauthorized service providers. That modification eliminated some features of the existing offering, which still included MSP licenses, access to Avaya's Support Website and preferred rates for remote support during the business day for equipment owners that did not contract with unauthorized service providers and companies such as UAC. P–49 at ROI000025–26. Under the modified Maintenance Assist offering, a $1.20 per port cost was introduced for Avaya PBX owners that contracted with unauthorized service providers and companies such as UAC. P–49 at ROI000024.

137. That April 2005 modification of the Maintenance Assist offering was partly to respond specifically to UAC's markedly strengthened sales efforts. Thus a March 16, 2005 Avaya presentation titled "Judo Strategy Beat United Asset Coverage" documents (a) Avaya's perception of the changes in UAC's "value proposition" that the company promoted beginning in 2004 and that Schumacher described in her testimony (Tr. 11/08/05 p.m. at 8:18–9:19) and (b) the reasons for Avaya's competitive responses. As late as March 2005 Avaya still regarded UAC as a "service referral company" and knew that UAC characterized itself as a "financial risk management" company. Avaya also believed that UAC's "primary target market [was] the Avaya maintenance base." P–49 at ROI000009.

138. Avaya's general understanding of UAC's business strategy since 1999 tracked descriptions given by UAC's executives in this case. Findings 9–16. Avaya understood that UAC had "aggressively attacked the Lucent/Avaya maintenance customer base from 1999 through 2002," "[r]educed" its sales force in 2001, recapitalized in March 2004 and "[h]ired 75 to 100 new sales people" in the year ending March 2005. P–49 at ROI000010.

139. Avaya was also well aware that UAC's objective was to displace Avaya maintenance agreements and that UAC was at that time "[p]romis[ing] the same remote monitoring capabilities as Avaya." P–49 at ROI000011 & ROI000012. In March 2005 Avaya "[a]nticipate[d]" that UAC would attack Avaya's maintenance contracts with equipment owners, or "named accounts," that it regarded as among its most important customers, as well as others. P–49 at 000015; Tr. 11/9/05 p.m. at 98:18–99:1 (Schumacher testimony).

140. In late June 2005 Avaya decided to act on its suspicions that unauthorized service providers were gaining access to maintenance software that Avaya made available only to its own Tier I technicians (through CRAFT logins), to its Business Partners (through DADMIN logins) and to Avaya PBX owners (through MSPs) whose own personnel performed Tier I level maintenance services. As Finding 129 states, Avaya determined it would not renew Maintenance Assist agreements or enter into new Maintenance Assist agreements with PBX owners that used unauthorized service providers such as UAC.

141. At the same time Avaya decided to discontinue providing T & M service to PBX equipment owners that used unauthorized service providers. Finding 129. As

Schumacher pointed out, the consequence of such service had been that Avaya was effectively providing more support to unauthorized service providers such as UAC than it had been to its own Business Partners. Tr. 11/08/05 p.m. at 10:11–11:1. As Findings 90–92 reflect, Avaya's Business Partners agree not to engage in the very business tactics that are central to UAC's strategy: They agree not to solicit Avaya's existing maintenance contract clients unless invited to submit proposals and not to interfere with Avaya's existing maintenance contracts. Avaya will not provide support, including DADMINs, to a Business Partner in such circumstances or if a Business Partner assists an unauthorized service provider that interferes with an Avaya maintenance relationship. Finding 92. Avaya plainly had sound business reasons to discontinue its own activities that were very similar, if not identical, to the activities in which its Business Partners agreed not to engage.

142. Avaya concluded that as a result of its "look[ ] at total T & M" it should not eliminate T & M support for PBX owners that were truly self-maintainers or that relied on Avaya's T & M services but that did not use unauthorized service providers that, for example, had unhooked Avaya maintenance contracts. Tr. 11/08/05 p.m. at 10:11–11:17 (Schumacher testimony); P–84 at AVAUAC 00026020–23.

143. Schumacher testified that the June 13, 2005 UAC/NextiraOne transaction was one of the top reasons ("[i]f not the top" reason) for Avaya's July 1, 2005 decisions. Tr. 11/09/05 p.m. at 135:18–25. Schumacher further testified that among the reasons the UAC/NextiraOne transaction caused Avaya concern was the new access UAC gained to Nortel equipment owners that also were Avaya equipment owners. Tr. 11/08/05 p.m. at 11:24–13:5.

144. Avaya prepared a document titled "Analysis of Maintenance Contract Ero-

sion, Cancellations, and T & M Billing" dated June 2005 that was used in discussions in late June 2005 that resulted in the July 1, 2005 decisions. P–84; Tr. 11/08/05 p.m. at 10:11–11:1 (Schumacher testimony); Tr. 11/09/05 a.m. at 48:11–49:8 (Schumacher testimony). One section of that document is headed "UAC Impact" and details what Avaya believed at the time to be the "key implications" of the UAC/NextiraOne transaction as follows:

Key Implications of June 14th Announcement

- UAC purchased a portion of NextiraOne's maintenance contracts and, therefore, the customer relationship

- UAC has agreed to buy technician services from NextiraOne giving UAC a significant, skilled technician workforce across the U.S.

- This partnership makes UAC considerably less dependent on Avaya for T & M Maintenance and technical expertise

- It also lowers UAC's cost of deploying field resources as compared to contracting Avaya at T & M rates

P–84 at AVAUAC 00026015–16.

145. Avaya's identification of UAC's acquisition of NextiraOne's "customer relationships" was hardly prescient. For Avaya to expect UAC to do anything else than attempt to exploit its 8,000 new clients and thus to penetrate further Avaya's own base of maintenance contracts with these same clients would have been foolhardy. That after all had always been UAC's modus operandi. Findings 94–95. Martucci, Pendergast and Fitzsimmons have all testified that was one of the principal objectives of the transaction for UAC. Finding 124. For UAC or anyone else to expect Avaya not to respond to the UAC/NextiraOne transaction as it did on July 1, 2005 is equally foolhardy, yet Martucci has tes-

tified that UAC did not consider Avaya's possible response to this transaction. Finding 127. UAC's failure even to consider, let alone to prepare for, Avaya's likely response to this major competitive action that UAC took is not the type of business risk against which the law is intended to protect.

### UAC's Present Circumstances

146. UAC sent a letter dated August 30, 2005 to those of its clients that owned Avaya equipment and did not have Maintenance Assist contracts with Avaya. P–176; Tr. 10/26/05 a.m. 6:17–23 (Martucci testimony). Among other things the letter offered those clients the option to terminate their agreements with UAC. P–176. UAC sent approximately 380 letters to "non-MSP clients" and additional letters to MSP clients whose MSPs were expiring within that same time frame. Tr. 10/28/05 p.m. 109:25–110:8 (Lochner testimony). By mid-October 2005 187 UAC clients had terminated their agreements with UAC. Oct. 17, 2005 deposition of Rick Lochner ("Lochner Dep.") 104:6–11. (COCO)

147. At the preliminary injunction hearing UAC provided its estimates of the number of Avaya PBXs that are covered by Maintenance Assist agreements that will expire monthly over the 12 month period from July 2005 to June 2006. P–239; Tr. 10/28/05 a.m. 62:19–64:15 (Lochner testimony). UAC estimated that it had a total of 1284 PBXs with MSPs active under agreement, and that the MSPs or Maintenance Assist Agreements for 646 of them (or 50.3%) would expire as of the end of December 2005. *Id.*

148. By their terms, the MSPs or Maintenance Assist agreements for the remainder of the PBXs will expire month to month through June 2006. P–239. Although UAC contends that it will lose clients whose Maintenance Assist agreements expire during that period, Fitzsimmons agreed that if any trial takes place after June 30, 2006 (as will indeed be the case), it will at that time be possible, with the resulting benefit of hindsight, to quantify more precisely any damages due to the loss of any of those additional customers. Tr. 11/7/05 p.m. 90:25–91:8 (Fitzsimmons testimony).

149. UAC claimed at one point in this case that it was in immediate danger of defaulting on vital loans due to Avaya's July 1, 2005 decisions, projecting an imminent possible collapse of the company. But Martucci has since testified that although UAC's lenders have a right to call the loans if UAC defaults, they will not in fact do so. Instead they will put UAC on notice that within a cure period it must reduce its debt balance "to be in line with the new smaller earnings that [UAC will] have as a result of this transaction." Tr. 10/26/05 a.m. 31:19–33:14. Stating that he had already begun discussions with UAC's lenders, Martucci testified that "more likely what will happen is the bank [will] renegotiate with UAC to become compliant. In all cases that renegotiation will require a paydown of the loan and [UAC] will have to bring in equity to do that so the shareholders will lose ownership. That's more likely what's going to happen." Tr. 10/26/05 a.m. 33:6–11 & 33:13–14.

150. Fitzsimmons testified that a preliminary injunction would leave UAC "somewhat tainted in how it can perform." Tr. 11/7/05 p.m. 94:19–98:10. If this Court were to enter the preliminary injunction that UAC seeks, UAC plans to approach the former clients to whom it sent its August 30 letter in an effort to win back their business. In that event UAC plans also to advise those clients and UAC's prospective clients that a preliminary injunction has been issued, that UAC may lose at trial and that Avaya could implement its July 1, 2005 decisions at that point. Tr. 10/27/05 a.m. 48:14–18 (Pender-

gast testimony). UAC also plans to tell the same thing to those clients that have Maintenance Assist agreements to whom UAC did not send its August 30 letter. Tr. 10/28/05 a.m. 16:20–17:3 (Pendergast testimony).

151. Even UAC's business executives recognize that a preliminary injunction would at best have limited positive benefits for UAC's sales efforts. Though claiming that a preliminary injunction would allegedly allow UAC to "compete fairly," Pendergast testified that UAC will not win all of its lost clients back. Tr. 10/28/05 a.m. 17:8–16. Even Martucci expressed his skepticism about the value of a preliminary injunction, testifying that, "[w]e don't expect to be able to [win] back the customers that we have lost already, not all of them, some of them we hope." Tr. 10/26/05 a.m. 31:6–17.

152. Fitzsimmons also testified that he expects to be able to calculate damages in the event an injunction is denied. Tr. 11/7/05 p.m. 114:16–115:5. In addition he testified that, while subject to some uncertainty, he expected his calculations in the absence of a preliminary injunction to be "the most reasonable damages possible" and reliable in his line of work. Tr. 11/7/05 p.m. 115:12–116:3.

### Conclusions of Law
#### Operative Standards

■ 1. In late November 2005 our Court of Appeals reconfirmed the limited role of preliminary injunctive relief in federal court jurisprudence in *Goodman v. Ill. Dep't of Fin. & Prof'l Regulation*, 430 F.3d 432, 437 (7th Cir.2005) (emphasis in original):

> As the Supreme Court has observed, '[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion.' *Mazurek v. Armstrong*, 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997) (*quoting* 11A Charles A. Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure § 2948, pp. 129–30 (2d ed.1995)).

Both because of its felicitous exposition of the criteria that the movant must meet (subject to the caveat expressed in the Introduction to these Findings and Conclusions as to the need to avoid confusion as to the significance of the phrase "the plaintiff's chances are better than negligible") and because of its sequential treatment of five rather than four such criteria, this Court has regularly employed the description in *Roland*, 749 F.2d at 386–88 of what a plaintiff must prove to justify such interim relief: (1) plaintiff has no adequate remedy at law, (2) plaintiff will suffer irreparable harm if the preliminary injunction is denied, (3) the balance of harms favors plaintiff, (4) plaintiff has a reasonable likelihood of success on the merits and (5) issuance of the injunction will not disserve the public interest.

2. Indeed, plaintiffs must meet a more stringent burden when seeking an injunction that would command defendant to take a particular action. Any such mandatory injunction is "cautiously viewed and sparingly issued," and "interlocutory mandatory injunctions are even more rarely issued, and neither except upon the clearest equitable grounds" (*Graham v. Med. Mut. of Ohio*, 130 F.3d 293, 295 (7th Cir. 1997) (quoting earlier case law)). UAC asks this Court to require Avaya (1) to renew agreements with PBX equipment owners despite its contractual right not to renew such agreements, (2) to enter into new agreements with PBX equipment owners and (3) to perform ad hoc "time and materials" service for PBX owners that it does not wish to serve. Consequently UAC's motion must be denied unless it proves "the clearest equitable

grounds" justifying such a mandatory preliminary injunction.

3. As the following Conclusions demonstrate, UAC has failed to meet the tests set out in *Roland* for the issuance of any preliminary injunction. UAC cannot satisfy the threshold factors requiring that it have no adequate remedy at law and that the balance of harms is in its favor in terms of the "sliding scale" approach taught by *Roland*, 749 F.2d at 388. Its position on the other criteria for relief is also problematic, though the deficiencies just stated suffice to call for the denial of relief.

4. Moreover, the specific injunction that UAC seeks is inappropriate for other reasons set out in later Conclusions.

### *Adequacy of a Remedy at Law; Irreparability of Harm*

5. *Graham*, 130 F.3d at 296 (internal quotation marks and citations omitted) has conflated the requirements of inadequacy of a remedy at law and of irreparability of harm:

> Irreparable harm is harm 'which cannot be repaired, retrieved, put down again, atoned for . . . .' [T]he injury must be of a particular nature, so that compensation in money cannot atone for it.

Indeed *Roland*, 749 F.2d at 386, after an exhaustive review of the legal authorities, concluded that there are only four situations in which insufficiency of the legal remedy of damages would justify a preliminary injunction: (a) plaintiff's inability, absent a preliminary injunction, to remain in business; (b) plaintiff's inability to finance the litigation through trial absent a preliminary injunction; (c) the potential insolvency of defendant absent a preliminary injunction (such that defendant would not be able to pay a resulting award); and (d) an alleged loss whose nature "make[s] damages very difficult to calculate."

6. None of the first three possibilities identified in *Roland* exists here. First, even though UAC alleged, both in its complaint and in earlier proceedings seeking a temporary retraining order, that Avaya's July 1, 2005 decisions might destroy its business, UAC has not even approached a showing that it faces insolvency in the absence of equitable remedies (in fact, the evidence is to the contrary). While UAC has presented evidence that absent a preliminary injunction it might lose some more customers, there is no evidence even suggesting that UAC will go out of business or be unable to proceed to a trial on the merits without a preliminary injunction. Instead the evidence shows that the June 2005 NextiraOne transaction added 8,000 customers to UAC's pre-existing customer base of approximately 900 customers, as a result of which UAC is hardly dependent upon Avaya maintenance business for its survival. And as to the second and third possible scenarios, there is no evidence (or even any contention) that UAC cannot finance continued litigation without a preliminary injunction, much less that Avaya might become insolvent before trial unless this Court enters a preliminary injunction.

7. Hence, the only conceivable basis on which UAC might meet its burden of showing the inadequacy of a remedy at law and the irreparability of harm is that damages would be unusually difficult to calculate in this case. UAC has presented some evidence that it has lost contracts and asserts that it will continue to lose contracts and suffer other injuries, including injury to reputation, as a result of Avaya's policy. True enough, it is often difficult to calculate precisely the damages resulting from lost sales, and that can make the calculation of damages a less than perfect process. But the analysis does not end there, as the ensuing more precise analysis discloses.

8. UAC asserts that it has lost clients as a result of Avaya's policy, and considerably fewer than half of UAC's clients owning Avaya PBXs remain. By UAC's estimation, for example, the Maintenance Assist agreements for 646 of the 1284 Avaya PBXs covered by UAC contracts as of July 2005 will have expired by December 2005, but only 65 of UAC's clients have Maintenance Assist agreements (though this Court recognizes UAC'S argument that they are among its largest clients). What is more significant is that while UAC's damages witness Fitzsimmons opined that it is difficult to predict today what harm will flow from the potential loss of any of those customers between the time of the hearing and the date of trial on the merits, he also acknowledged that if any trial takes place after June 30, 2006 (a certainty in light of (a) what remains to be done before trial and (b) this Court's calendar), it will at that time be possible, with the resulting benefit of hindsight, to quantify more precisely any damages due to the loss of any of those additional customers. Moreover, that more precise calculation based on actual experience will also provide a greater ability to evaluate other elements of claimed damages (such as the claimed loss of prospective business).

9. Consistently with what has been said in Conclusion 8, Fitzsimmons also testified that he expects to be able to calculate damages in the event an injunction is denied and that, while subject to some uncertainty, he expected his calculations in the absence of a preliminary injunction to be "the most reasonable damages possible" and reliable in his line of work. In the view of UAC's own damages witness, then, this is not a case in which the ultimate damages calculations would be too speculative. Instead it is a case, like many cases under the Sherman Act, in which damages (if any) must be calculated based on an estimate of losses due to the harm (if any) caused to plaintiff by defendant's anticompetitive conduct (if any).

10. In antitrust cases particularly, uncertainty about the precise amount of damages has never deprived a successful plaintiff of adequate compensation. Juries are entitled to draw inferences adverse to the defendant if the defendant's misconduct has made damages more difficult to compute (*Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264, 66 S.Ct. 574, 90 L.Ed. 652 (1946)). And of course any damages, based on proper inferences if necessary, would be automatically trebled by the Court. In sum, UAC has not established that damages would be an inadequate remedy.

11. As for the irreparability-of-harm requirement, *Roland,* 749 F.2d at 386 teaches:

> The requirement of irreparable harm is needed to take care of the case where although the ultimate relief that the plaintiff is seeking is equitable, implying that he has no adequate remedy at law, he can easily wait till the end of trial to get that relief.

As stated in Conclusion 6, UAC no longer appears to contend (and it never succeeded in proving) that it faces financial collapse unless this Court enters a preliminary injunction. Rather, as Fitzsimmons explained, UAC contends that Avaya's July 1, 2005 decisions prevent UAC from carrying out its full business plan and that they compromise UAC's reputation in the marketplace at a critical time, in ways that UAC asserts could not be fully corrected after trial.

12. But even if that contention were to be credited (something that need not be decided at this time), the alleged harm to UAC's reputation would not really be averted by a preliminary injunction. After all, such a preliminary injunction—which by definition might be modified or revoked

after trial—would not confer the kind of certainty that UAC assertedly needs to convince clients and prospective clients that it has the long-term capability to secure maintenance services for their Avaya PBXs. On the contrary, a preliminary injunction that was later dissolved could leave exactly the opposite effect of creating greater reputational harm because UAC ultimately could not deliver the services that it had promised.

13. To expand on what has been said in Conclusion 12, in all events—whether or not this Court issues the requested preliminary injunction—uncertainty about the legality of Avaya's challenged decisions will continue to impact UAC's ability to contract with owners of Avaya PBX equipment until this case has been finally adjudicated on the merits. For example, if this Court were to enter a preliminary injunction, UAC plans to approach former clients in an effort to win back their business. But in doing so UAC will also advise those PBX owners, as well as any other prospective clients, that a preliminary injunction has been issued, that UAC may lose at trial and that Avaya could reinstitute the July 1 decisions at that point. Even UAC's business executives recognize that a preliminary injunction would have at best limited positive benefits for its sales efforts. Though claiming that a preliminary injunction would allegedly allow UAC to "compete fairly," Pendergast testified that UAC will not win all of its lost customers back. And even Martucci expressed his skepticism about the value of a preliminary injunction, testifying that "[w]e don't expect to be able to [win] back the customers that we have lost already, not all of them, some of·them we hope." Hence a preliminary injunction cannot not remove doubts about the final outcome of the case, and as Fitzsimmons testified, a preliminary injunction would leave UAC "somewhat tainted in how it can perform . . . ."

14. To shift gears a bit, a plaintiff's entitlement to preliminary injunctive relief requires it, in addition to showing that its harm is irreparable, to show that the harm is "imminent" as well *(Bedrossian v. Northwestern Mem. Hosp.,* 409 F.3d 840, 844 (7th Cir.2005)). UAC has also fallen at that hurdle. Much of its alleged injury lies in the past. Avaya's decisions of which UAC complains have been effective since July 1, 2005. UAC sent a letter dated August 30, 2005 to those customers who owned Avaya equipment and did not have Maintenance Assist contracts with Avaya. Among other things, the letter offered the customers the option to terminate their agreements with UAC. UAC sent approximately 380 letters to "non-MSP clients" and additional letters to MSP clients whose MSPs were expiring within that same time frame. By mid-October 2005 187 UAC customers had terminated their agreements with UAC. And as noted previously, UAC estimates that Maintenance Assist agreements for 646 of the 1284 Avaya PBXs under UAC agreements as of July 2005 would have expired by December 2005—which through no one's fault is also now a date that has passed. To the extent that UAC's reputation has assertedly suffered as a result of its lost customers, that wound also lies in the past—for such· antecedent injuries, the damage (if any) is done. And as stated in Conclusion 9, Fitzsimmons has testified he is capable of calculating such damages with sufficient confidence to support a judgment. ·

15. There are other injuries initially predicted by UAC that simply never happened and that are not now likely. For instance, UAC claimed at one point that it was in immediate danger of defaulting on vital loans due to Avaya's July 1, 2005 decisions, projecting an imminent possible collapse of the company. But

Martucci has testified that although UAC's lenders have a right to call the loans if UAC defaults, they will not in fact do so. Instead they will put UAC on notice that, within a cure period, it must reduce its debt balance "to be in line with the new smaller earnings that [UAC will] have as a result of this transaction." Noting that he had already begun discussions with UAC's lenders, Martucci testified that "more likely what will happen is the bank [will] renegotiate with UAC to become compliant. In all cases that renegotiation will require a paydown of the loan and we will have to bring in equity to do that so the shareholders will lose ownership. That's more likely what's going to happen."

### Balancing of Harms; the Sliding Scale

16. In deciding whether to grant a preliminary injunction here, this Court must also consider harm the injunction might cause to Avaya (*Roland,* 749 F.2d at 387), applying the sliding scale approach that links the balancing of harms to the likelihood (or unlikelihood) of UAC's success on the merits (*id.* at 387–88). That latter factor will be evaluated hereafter, but for present purposes it suffices to say that the harm to Avaya from any granting of preliminary injunctive relief, as set out in the next set of Conclusions, causes the sliding scale to tip heavily in Avaya's favor.

17. For one thing, requiring Avaya to license MSPs or sell T & M services to customers with whom Avaya does not wish to deal is the epitome of irreparable harm to a defendant. If this Court were to issue the requested preliminary injunction, Avaya "will be frozen into an intimate and continuous relationship with" customers that "it no longer wishes to be associated with" (*Jack Kahn Music Co. v. Baldwin Piano & Organ Co.,* 604 F.2d 755, 764 (2d Cir.1979), *cited and quoted in Roland,* 749 F.2d at 392). That is so because many, if not all, of those customers have provided access to Avaya's maintenance software to companies such as UAC that are intent on subverting Avaya's own "business model."

18. Though Fitzsimmons asserted that the harm caused to Avaya by a preliminary injunction would be less than the harm UAC would suffer without such an injunction, that is both wrong and ironic: While much is sought to be made of the risks to UAC's business reputation, Fitzsimmons (and UAC) have failed to consider the intangible harm to Avaya's reputation of being forced to make court-ordered sales it does not wish to make, while being precluded by court order from pursuing the competitive strategy it wishes to pursue. Avaya's long-term customer relationships are thus at risk as well.

19. Relatedly, UAC has proffered testimony by its CEO Martucci as well as Fitzsimmons to the effect that Avaya's July 1, 2005 decisions harm UAC by preventing UAC from carrying out its business strategy. To whatever extent Avaya's policy constrains UAC's business plan and harms UAC, a preliminary injunction would constrain Avaya's business plan and harm Avaya in the same manner, and UAC has not presented any evidence showing that the balance tips in its favor.

20. Nor did Fitzsimmons attempt to quantify or describe the balance of hardships between Avaya and UAC in any meaningful way, rather opining that "a detailed enumeration and comparison of the categories of expected damages for Avaya and UAC would be an exercise in false precision." Instead he admittedly focused "primarily" upon "impacts on reputation," thus ignoring other sources of harm to Avaya—things such as the harm to its business relationships with its Business Partners, its loss of "the value of its right to use for its maintenance software" and its being placed "in a regulated business environment where every contract with every customer would face scrutiny

under a broadly defined injunction." In addition, Fitzsimmons impermissibly minimized the harm to reputation that Avaya will suffer if an injunction is issued.

21. Avaya presented evidence that based on customer research, "win-loss" studies and experience, customers consider maintenance service performance and reputation as the most important criteria in determining supplier selection with respect to future equipment purchases and continuation of existing maintenance contracts. Thus sales of PBX equipment are closely linked to maintenance contracts, and Avaya equipment owners with Avaya maintenance contracts are more likely to buy their next PBX system from Avaya. Moreover, Avaya also presented evidence that lower-cost, lower quality T & M service, which is one kind of service provided by Avaya and essentially the only kind provided by UAC, actually devalues Avaya's maintenance contracts. Hence the preliminary injunction that UAC seeks would require Avaya to continue to perform the T & M services that the evidence shows puts Avaya at greater risk to lose the next PBX sales.

22. Both parties' evidence indicates that a preliminary injunction enabling UAC to form relationships with Avaya equipment owners would expose Avaya to a significant risk of losing future equipment sales as well as future maintenance sales. While there is a conflict in Mr. Martucci's deposition and hearing testimony regarding the extent to which NextiraOne now has access to UAC's client base to sell Nortel PBXs as a result of its June 2005 agreement with UAC, one of the clear results of that transaction is that UAC, with its 200 technicians trained to maintain Nortel PBXs, now has a greater incentive to encourage its clients to replace Avaya PBXs with new Nortel PBXs (rather than new Avaya PBXs) than it had before the acquisition. Moreover, to the extent that UAC displaces Avaya contracts to maintain the Avaya PBX equipment owned by the 8,000 customers whose mostly Nortel maintenance contracts UAC acquired from NextiraOne, Avaya's regular contact with those customers will end or be weakened, so that its opportunities to sell them new Avaya PBXs will be diminished.

23. Avaya's July 1, 2005 decisions, issued just two weeks after the UAC–NextiraOne transaction, restrict UAC's ability to expose large numbers of Avaya equipment owners to equipment sales pitches from NextiraOne. They also restrict UAC's ability to displace the maintenance agreements between those equipment owners and Avaya or Avaya's Business Partners. If this Court were to enjoin Avaya even preliminarily from implementing those decisions, the competitive harm to Avaya will be at least the mirror image of the harm UAC claims to suffer as a result of the policy. In fact the risk to Avaya is greater, for only Avaya (and not UAC) would be harmed if an Avaya equipment owner switched not only its maintenance contract to UAC, but also its next purchase of equipment to a competitor, including Nortel brand equipment purchased from NextiraOne.

24. Next Fitzsimmons ignored the harm to Avaya's business relationships with its Business Partners that would result from a preliminary injunction. Before July 1, 2005 Avaya was effectively providing more support to unauthorized service providers and companies like UAC than it had been to its own Business Partners that agree *not* to engage in the very business tactics that are central to UAC's strategy, under which it to solicits Avaya's existing maintenance contract clients and interferes with Avaya's existing maintenance contracts. Preliminary injunctive relief would effectively require Avaya to continue this

imbalance, putting its relationships with its Business Partners at risk.

25. Finally, the balance of the harms tips further in Avaya's favor, and the harm that Avaya will incur if the Court were to issue a preliminary injunction takes on more significance, because the injunction that UAC seeks would be of only modest benefit to it. As already shown, much of the harm about which UAC complains has already been incurred, and a preliminary injunction cannot remove the doubts about the final outcome of the case that will beset UAC's efforts to sell its agreements in the interim.

26. In sum, the "balance of hardships" factor does not favor a preliminary injunction. Although the levels of uncertainty in both directions make it difficult to arrive at a comparative quantitative evaluation with a high level of confidence, it is fair to say that the balance—if not in equilibrium—tips in Avaya's favor, and this Court so holds. These Conclusions turn then to the issue of likelihood of succeed on the merits, to be evaluated in "sliding scale" terms. But before that is done, it must always be remembered that what has already been said in Conclusions 5 through 15 calls for denial of preliminary injunctive relief in all events.

### Standing?

27. "In order to maintain an antitrust action, plaintiffs must establish that they (1) have suffered antitrust injury and (2) are the proper plaintiffs to maintain an antitrust action with respect to [the relevant] markets." (*Serfecz v. Jewel Food Stores*, 67 F.3d 591, 596–97 (7th Cir.1995)). Here Avaya has raised a substantial question as to whether UAC is the proper plaintiff to pursue the antitrust claims it has made in this case. Although for present purposes it is unnecessary to resolve that issue, for UAC fails on other grounds in any event, a brief review of the subject is appropriate because the existence of a material question in that respect tips the already unbalanced scales further in Avaya's direction.

28. Even if UAC could establish that maintenance services for Avaya PBXs is a separate relevant market for antitrust purposes (a questionable proposition at best), it faces the further possible deficiency that it admittedly does not itself provide maintenance for Avaya PBXs. Instead Avaya and Avaya Business Partners almost exclusively provide maintenance for Avaya PBXs owned by UAC clients. Those service providers actually compete directly to service Avaya PBXs. UAC has provided no evidence that the number of those providers has decreased, that the quality of those services has declined or that the prices those providers charge have increased because of Avaya's July 1, 2005 decisions. Instead UAC claims harm to itself as a service referral company, an insurer (the label used by its own economics expert Stiroh, Finding 5) or financial services provider with respect to Avaya PBXs. And UAC has nowhere asserted there has been a reduction in competition in any relevant market for service referrals, insurance or financial services.

29. This is not merely a problem in semantics. Our Court of Appeals has repeatedly held, as it repeated in *Serfecz*, 67 F.3d at 598, that " 'only those parties who can most efficiently vindicate the purposes of the antitrust laws have antitrust standing . . . .' " Other parties who are "more indirectly" related to the "antitrust conduct" have no standing under the antitrust laws (*id.*). Put simply, "a party cannot recover [under an antitrust theory] when others more directly injured are better able to state a claim" (*Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 489 (7th Cir.2002)), for "[i]t is reasonable to assume that Congress did not intend to allow every person tangentially affected by an an-

titrust violation to maintain an action to recover threefold damages for the injury to his business or property" (*Blue Shield of Va. v. McCready,* 457 U.S. 465, 476–77, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982)).

30. That principle is akin to the *Illinois Brick* doctrine that limits antitrust recovery to direct rather than indirect purchasers. Like approaches have been taken in limiting recovery to insureds rather than their insurers (*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic,* 65 F.3d 1406, 1414 (7th Cir.1995); *Int'l Bhd. of Teamsters Local 734 v. Philip Morris Inc.,* 196 F.3d 818, 823 (7th Cir. 1999)) and in holding that a company that markets a competitive product, but does not itself produce that product, is not a "competitor" for purposes of antitrust standing (*Midwest Gas Servs. v. Ind. Gas Co.,* 317 F.3d 703, 708–11 (7th Cir.2003)).

31. As with the plaintiff in *Midwest Gas,* UAC does not itself compete head-to-head with Avaya in providing maintenance services for Avaya PBXs. Instead it forwards its clients' requests for maintenance to other service providers: to Avaya or to firms that actually compete with Avaya to maintain Avaya PBXs. Although UAC claims that it should be deemed to have suffered antitrust injury, its claim (like that in *Midwest Gas* ) appears to be based on the premise that a derivative competitor has antitrust standing. As stated in Conclusion 29, at a minimum that premise is sufficiently doubtful to provide incremental added support for the denial of preliminary injunctive relief to UAC.

### Likelihood of Success on the Merits

32. UAC's Response to Avaya's Proposed Findings and Conclusions stresses that its current motion is predicated solely on its claims of monopolization and attempted monopolization. This court will take UAC at its word by eschewing (without expressing any substantive views as to) any analysis of Avaya's demonstration of the asserted legal inadequacy of UAC's claims of unlawful tying (Avaya's Proposed Conclusions 40–70) or tortious interference (Avaya's Proposed Conclusions 103–32).

33. In terms of its claims of monopolizations and attempted monopolizations, UAC is flat-out wrong in the hyperbolic manner in which it begins the *Introduction* to its Response to Avaya's Proposed Findings and Conclusions, as quoted in the *Introduction* to these Findings and Conclusions. If *Kodak* were to be read as UAC would have it, UAC's likelihood of success on the merits would meet the *Roland* minimal threshold of "better than negligible." But even apart from the fact that the sliding-scale approach would require an extraordinarily heavy weighting of the balancing of harms in UAC's favor to support preliminary injunctive relief (and the earlier Conclusions have shown that the balancing weighs substantially in the other direction), a more neutral reading of *Kodak* would also torpedo UAC's contention.

34. It is worth nothing at the outset that *Kodak* involved the review of a summary judgment in favor of Eastman Kodak, so that the Supreme Court was called upon to decide what independent service providers *could* possibly prove if the facts, together with all favorable influences, were to be drawn in their favor. Here by contrast this Court has heard the evidence and makes its findings without such a heavy thumb (or any thumb) on the scales in UAC's favor.

35. More significantly, what Eastman Kodak withheld from the independent service providers in its case were repair parts in which it had no proprietary interest, so that the sale of those parts and the sale of maintenance services had the potential for posing a classic case of illegal tying. By sharp contrast, the software built into Avaya's PBXs to facilitate their maintenance

and repair is proprietary, so that the extent of Avaya's legitimate control over access to that software is of a different magnitude by definition. And Avaya does not condition such access on its own provisions of maintenance—rather it makes such access available to the owners of its PBXs who wish to self-maintain that equipment through the entry into Maintenance Assist agreements that carry with them MSP licenses.[2] It is thus entirely legitimate to adopt the perspective that access to that software for maintenance and repair purposes is integral to the maintenance and repair, rather than constituting a separate relevant market for antitrust purposes. And that permissible perspective would contraindicate UAC's likelihood of success on the merits.

36. For that purpose *Goldwasser v. Ameritech Corp.*, 222 F.3d 390, 396–97 (7th Cir.2000) teaches that "unilateral conduct must be approached with the utmost caution, lest the law forbid desirable, robust competition." So even if UAC were able to prove the elements of a monopolization claim, Avaya has no antitrust liability if it shows that it had "valid business reasons" for its July 1, 2005 decisions (*Kodak*, 504 U.S. at 483, 112 S.Ct. 2072).

37. As to the monopolization claim itself, UAC relies on the opinion of its economics witness Stiroh that maintenance for Avaya PBXs is a relevant product market. Stiroh opines that "[b]ecause Avaya equipment owners are effectively locked into their equipment purchase once it has been installed, a separate market exists for the maintenance and service of this equipment," for which opinions she relies on her having "concluded" that "[a]t the time of

purchase" owners "lacked information about Avaya's post-warranty MSP access policies for the maintenance of Avaya telecommunications equipment" (a conclusion based on what she terms a "lack of information" about a post-hoc event: Avaya's July 1, 2005 decisions not to renew, or to enter new, Maintenance Assist agreements with owners using unauthorized service providers or companies such as UAC). That in turn rests on Stiroh's statement that Avaya PBX purchasers "prior to the July 2005 policy change were unable to correctly value the lifetime cost of ownership of their equipment because at the time they made their purchase [they] had the option of using UAC or another low-cost service provider to service their equipment." P–200 at 14–15.

38. That type of analysis—or lack of analysis—borders on the absurd. No one has an unclouded crystal ball as to future events, nor does anyone have a vested right in the expectation that the future will remain the same as the present. By definition any purchaser of Avaya PBXs had to evaluate the potential total cost of that equipment (including future maintenance and repairs) based on the best available information at the time of purchase—but any rational economic being had to understand that the marketplace contains no guaranties of a static future.

39. On that score Stiroh's testimony suggested that before July 1, 2005 Avaya PBX purchasers had UAC or "another low-cost provider" (not one of which she could name) in mind at the time of their purchases. It is worth noting parenthetically that such PBX owners had a number

---

**2.** UAC's proposed Findings 25–28 attempt to rely on the copyright license decisions in *Storage Tech. Corp. v. Custome Hardware Eng'g & Consulting, Inc.*, 421 F.3d 1307, 1316–17 (Fed.Cir.2005) and *Hogan Systems, Inc. v. Cybresource Int'l, Inc.*, 158 F.3d 319, 322–23 (5th Cir.1998) as purportedly supporting its

access to Avaya's MSP software. But those cases provide no comfort, to UAC, for in each instance the court's analysis rested on language in the license agreement that authorized such access, while Avaya granted no such authorization in its personal and nonassignable licenses.

of possible low-cost maintenance options available at the time of equipment purchase (T & M service only, Avaya Business Partners, self-maintenance), yet most of them chose Avaya's higher cost and more comprehensive maintenance contracts for post-warranty maintenance. But what is more significant is that no such owner could have had a legitimate expectancy that UAC would be able to perpetuate its bootleg access to MSPs that were the subject of personal (and hence nonassignable) licenses running to owners to whom Avaya intended to extend only the option of self-maintenance.

40. In that regard it is accurate to characterize Avaya's July 1, 2005 policy as involving a refusal to deal with certain PBX owners because they in turn, in violation of their own licensed access to MSPs, make such access available to unauthorized service providers such as UAC. To be sure, *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 601, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985), has said that "[t]he high value that we have placed on the right to refuse to deal with other firms does not mean that the right is unqualified." But more recently *Verizon Communications Inc. v. Law Offices of Curtis v. Trinko, LLP*, 540 U.S. 398, 409, 124 S.Ct. 872, 157 L.Ed.2d 823 (2004) has made clear that *Aspen Skiing* is a refusal-to-deal decision that "is at or near the outer boundary of § 2 liability." Even as to a monopolist, *Verizon, id.* at 408, 124 S.Ct. 872 explains further that the Court has been "very cautious" to deem a "refusal to cooperate with rivals" as anticompetitive conduct under Section 2, "because of the uncertain virtue of forced sharing and the difficulty of identifying and remedying anticompetitive conduct by a single firm."

41. This is plainly a case for inaction, for Avaya's July 1, 2005 decisions are well beyond the outer bounds of liability established by *Aspen Skiing*. Avaya correctly urges that it has never engaged in any voluntary course of conduct with UAC or any unauthorized service provider as to MSPs, asserting that MSPs have been denied to any third-party providers from the time that they were introduced and pointing to its express declination to engage in any cooperative arrangement with UAC on at least three occasions over an eight-year period.

42. It is true that Avaya entered into and renewed Maintenance Assist agreements with UAC clients before July 1, 2005, but UAC's CEO Martucci acknowledged that to his knowledge Avaya never supported UAC's use of a client's MSP. UAC began to use MSPs remotely no earlier than late 2002, and Avaya did not come to appreciate that some PBX owners were making MSPs available to UAC until the latter substantially strengthened its marketing efforts in 2004. Avaya did provide T & M service to UAC clients before July 1, 2005, but it did so because it wanted to maintain its relationships with Avaya PBX owners who previously had Avaya maintenance contracts—not because it was engaging in any form of joint activity with UAC.

43. What has been described in Conclusion 42 did not amount to "cooperation" with UAC, such as to preclude Avaya from enforcing its right to enforce the restriction imposed by its nontransferable MSP licenses. Because even "a firm with lawful monopoly power has no general duty to help its competitors, whether by holding a price umbrella over their heads or by otherwise pulling its competitive punches" (*Olympia Equipment Leasing Co. v. Western Union Tel. Co.*, 797 F.2d 370, 375 (7th Cir.1986)), Avaya certainly had no duty to help UAC, a company whose business strategy—seeking to shift PBX owners from Avaya maintenance contracts to contracts with UAC—is manifestly *non-coop-*

*eration* with Avaya. Avaya plainly did not "extend a helping hand" to UAC, and even if it had done so, Section 2 did not prevent Avaya from withdrawing it on July 1, 2005 (*Olympia Equip.*, 797 F.2d at 376).

44. Suppose however that the principles stated in Conclusions 37–42 had not (as they have) negated the elements of a monopolization claim. Even were that the case, it has already been stated that *Kodak*, 504 U.S. at 483 n. 32, 112 S.Ct. 2072 insulates Avaya from antitrust liability if it had "valid business reasons" or, phrased differently, "legitimate competitive reasons" for its refusal to deal with UAC's clients. Five such reasons are apparent from the record developed so far.

45. First and most obvious, the success of Avaya's business—both its sales of PBXs and its sales of maintenance—depends on its ability to obtain maintenance contracts with purchasers of its equipment and to retain those contracts for years. Avaya has specifically highlighted the significance of the revenue from maintenance contracts to its overall business in its annual report. It is also widely accepted in the industry that integrated equipment and service sellers such as Avaya need to maintain revenues from maintenance contracts to sustain their ability to compete effectively for the technology-driven new equipment sales and the follow-on maintenance contracts. Hence decisions made by Avaya to protect or augment revenues from maintenance contracts are presumptively made for "legitimate competitive reasons."

46. Second, UAC's strategy to shift PBX owners with Avaya maintenance contracts to UAC contracts, under which the maintenance would have been provided by Avaya or Avaya Business Partners' T & M service, directly conflicts with Avaya's legitimate business interest in maintaining and increasing its maintenance contract base. Because PBX owners with mainte-nance contracts receive more comprehensive and timely service than those using T & M service, they are more likely to buy new Avaya PBXs or upgrade the ones they already own. And the greater the sales of Avaya PBXs, the greater the sales of maintenance by Avaya will be.

47. Third, Avaya's Business Partners have agreed not to engage in exactly the kind of business conduct that is the hallmark of UAC's strategy: to convince PBX owners to abandon their Avaya maintenance contracts. For Avaya to support UAC in any way, when UAC is engaging in behavior that its Business Partners have agreed not to carry out, can legitimately be perceived as undermining the integrity of Avaya's relationship with its network of Business Partners, a principal distribution channel for Avaya equipment and maintenance.

48. Fourth, Avaya has invested heavily in its maintenance software and has long restricted access to that software to its own technicians, its Business Partners, Avaya PBX owners with maintenance contracts and the relatively small number of Avaya PBX owners who use their own staffs to perform maintenance functions. Avaya properly regards that software as providing it with a competitive advantage. Avaya has never intended to give access to that software to third-party service providers or to companies such as UAC—a legitimate policy. Avaya's July 1, 2005 decisions further implemented that policy.

49. Fifth, UAC greatly expanded its access to Avaya PBX owners, for the first time added a skilled technician workforce and linked up with a major Avaya competitor through its June 13, 2005 NextiraOne transaction. Avaya legitimately perceived UAC as having transformed itself from a "service referral company," an "insurer" or a "financial services provider" into something else on June 13, 2005. As the record

shows, Avaya and UAC itself believed that UAC posed a different kind of, and more serious, threat to Avaya's maintenance contract base after the NextiraOne transaction. Not only was Avaya's competitive response legitimate, it should have been reasonably expected.

50. All of the just-recited reasons demonstrate why courts are particularly wary of interfering with unilateral competitive conduct even when a firm is properly characterized as a "monopolist." UAC has pursued a strategy that targets a key component of Avaya's business (its PBX maintenance contracts), has sought to usurp the benefits available to an Avaya Business Partner (access to Avaya maintenance software) without taking on any of a Business Partner's obligations and has made major moves to reposition, if not totally redefine, itself competitively. At the same time it asks this Court to enforce a purported, but never existent, "cooperative" relationship between it and Avaya so that it is in an even better position to erode a core part of Avaya's business. In sum, Avaya made its July 1, 2005 decisions to avoid helping UAC to undermine Avaya's own "business model." It would be both unrealistic and unfair to expect Avaya to do otherwise—to inflict a major business wound on itself.

51. What has been said in Conclusions 37 to 50 as to UAC's monopolization claim applies with equal force to its Count III, which charges attempted monopolization. In that respect UAC merely refers to its preceding allegations in Verified Complaint ¶¶ 100–04. This Court will do no more: It incorporates by reference its Conclusions that negate the Section 2 monopolization claim.

52. Finally, UAC's Count IV claim that seeks to involve the so-called "essential facilities doctrine" (see *Fishman v. Estate of Wirtz*, 807 F.2d 520, 539 (7th Cir.1986)) has been virtually disclaimed by *Verizon*,

540 U.S. at 409, 411, 124 S.Ct. 872, which expressly said it has "never recognized such a doctrine." And our own Court of Appeals has said in *Blue Cross & Blue Shield*, 65 F.3d at 1412, that the Supreme Court decision regarded as the genesis of the doctrine, *United States v. Terminal R.R. Ass'n*, 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed. 810 (1912), "along with the rest of the decisions in the essential-facilities line, has been criticized as having nothing to do with the purposes of antitrust law."

53. Even if those disclaimers were not to be taken at face value as a disavowal of viability, the purported doctrine would be inapplicable here. To begin with, because Avaya makes MSPs available to equipment owners and DADMINs available to Business Partners, the absolute refusal to deal that the essential facilities doctrine appears to contemplate is not present here. Moreover, because the doctrine requires that MSPs and DADMINs jointly be deemed a "monopoly facility" (IIIA Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* ¶¶ 771–74 (2d ed.2002)), UAC must show that MSPs and DADMINs "dominate a properly defined relevant market" (*id.* ¶ 773c at 205)—a proposition already rejected by this Court. And lastly, Avaya's legitimate business reasons for its July 1, 2005 decisions defeat UAC's Section 2 claim whether it is advanced under the "refusal to deal" or under the "essential facilities" rubric (*id.* ¶ 773e).

### Public Interest

54. Because a plaintiff has the burden of establishing every element of a claim for preliminary injunctive relief, what has already been said in the foregoing Conclusions suffices to defeat UAC's current motion. But in the interests of completeness this Court goes on to address the last component identified in *Roland*, 749 F.2d at 388: "sometimes an order granting or denying a preliminary injunction will have

consequences beyond the immediate parties," and in such cases "the 'public interest' ... must be reckoned into the weighing process ...."

55. In this instance the "public interest," as so defined, can be viewed as looking in both directions. On the one hand, this Court's colleague Honorable Elaine Bucklo has said in *Am. Massage Therapy Ass'n v. Folkers,* 308 F.Supp.2d 899, 902 (N.D.Ill.2004) (emphasis added) that "the public interest will be served, not harmed, by *protection* of intellectual property"—here the prevention of UAC's unauthorized poaching on Avaya's proprietary software. On the other hand, although this Court has rejected UAC's position in substantive terms, UAC contends that the public interest is best served by preventing what it labels as anticompetitive conduct. In such circumstances, where it may be said that the grant of a preliminary injunction will either (a) serve the public's interest in upholding the antitrust laws but potentially harm the public's interest in protecting intellectual property or (b) serve the public's interest in protecting intellectual property but potentially harm the public's interest in competition, *Farmers Indep. Tel. Co. v. Thorman,* 648 F.Supp. 457, 459 (W.D.Wis.1986) has said that the public interest "does not compel a conclusion either way." But in all events UAC cannot be viewed as having met its burden of proving the necessity of a mandatory preliminary injunction by "the clearest equitable grounds" (*Graham,* 130 F.3d at 295).

**Alteration of the Status Quo**

56. At this point UAC has failed to clear more than one of the hurdles that it must overcome to obtain the relief it seeks. Because any one of those failures calls for denial of such relief, these Conclusions will not go on to consider several other grounds advanced by Avaya, with just one exception: the well-settled proposition that a preliminary injunction's purpose is to maintain the "last uncontested status preceding the [pending] controversy" (*LTD Commodities, Inc. v. Perederij,* 699 F.2d 404, 406 (7th Cir.1983)). Here, properly understood, such is not the case—and that provides still another basis for the denial of relief.

57. To begin with, the "last uncontested status which preceded the pending controversy" was not, as UAC contends, the status immediately preceding Avaya's July 1, 2005 decisions. Avaya and UAC were in a "contested status" before July 1, 2005 due to (a) UAC's unauthorized use of Avaya's MSPs prior to that date and (b) UAC's act of entering into a transaction with NextiraOne in mid-June 13, 2005, both leading to Avaya's July 1, 2005 decisions.

58. Even apart from what has been said in Conclusion 57, UAC's proposed Preliminary Injunction Order would impose upon Avaya obligations that it did not have before its July 1, 2005 decisions, would require Avaya to adopt judicially created policies that it never before adopted, prohibit Avaya from enforcing decisions that it adopted long before July 1, 2005 and would require Avaya to grant access to MSPs to PBX owners and unauthorized service providers to whom Avaya would not otherwise have granted access. Moreover, UAC seeks an order requiring Avaya to stop *not* providing MSPs and to stop *not* providing per-incident service to customers of unauthorized service providers—in essence, requiring Avaya to do something mandatory and affirmative. As stated earlier, mandatory injunctions are "cautiously viewed and sparingly issued" only "upon the clearest equitable grounds" (*Graham,* 130 F.3d at 295).

\* \* \* \* \* \*

This Court's omission of various of the Findings and many of the Conclusions proposed by Avaya should not be mistaken as

an expression of disagreement with Avaya's position in those respects—to the contrary, a number of the omitted grounds for denial of relief to UAC are totally sound and would supply independent bases for its failure to prevail at this stage. But what has been said here is more than sufficient to call for the denial of a preliminary injunction, and this Court so orders. This case is set for a status hearing at 9:30 a.m. January 20, 2006 to discuss the course of future proceedings.

### Appendix

After each of the parties had already submitted its own Proposed Findings and Conclusions and its response to the other side's corresponding submission, each delivered to this Court (belatedly, from its perspective) objections to various of the other's exhibits and, on the part of Avaya, also some objections to certain testimony cited by UAC in its proposals. Those submissions arrived just after this Court had completed its initial draft of these bulky Findings and the accompanying Conclusions, and this Court has had the opportunity to review the objections in conjunction with this document.

As for the Avaya objections to the exhibits, none of them appears to affect what this Court had originally prepared as its Findings and Conclusions. Accordingly, unless either party regards a specific ruling or rulings as necessary, those objections will simply be denied on mootness grounds. And as to Avaya's objections to testimony, those would seem to have been called for during the course of the preliminary injunction hearing, not after proofs had been closed-so absent any further submission by Avaya to justify the timing, those objections are denied on grounds of untimeliness.

More importantly, UAC has objected to a substantial number of Avaya's documentary exhibits-portions of its contract forms with its PBX customers that deal with the MSPs and Maintenance Assistance agreements that are at the heart of the present dispute. Those documents have been referred to in Findings 50, 51, 77–83 and 85. In an effort to buttress its objections, UAC further attacks the Verification and Second Verification by Sara Tompkins (Exs. D–212 and D–228) and the Verification by Karen Doebelin (Ex. D–229), all of which speak to the challenged documentary exhibits.

To begin with, objections as to an asserted lack of foundation for exhibits-here objections that account for a large part, if not the principal part, of UAC's complaints-are most often really a claim of the absence of authentication under Fed. R.Evid. ("Rule") 901. And as such they are seldom meritorious, unless of course there is real cause for concern as to the bona fides of the documents involved. On that score nothing suggests that any of the challenged forms here were newly generated for purposes of this lawsuit or are otherwise suspect, rather than being wholly legitimate parts of Avaya's contractual undertakings with its PBX customers over time.

Relatedly, whenever this Court obtains from lawyers the proposed Final Pretrial Order (based on the form prescribed in this District Court) that it always requires in anticipation of trial, it invariably instructs the lawyers during the pretrial conference that it holds a few working days later that any objections assertedly based on a lack of foundation must be resolved and eliminated in advance of the trial itself. That principle applies, that is, unless there is some good reason to believe that the document has been fabricated or is otherwise illegitimate.

In this instance the fact that what is at issue is a proposed preliminary injunction rather than a full-blown trial on the merits,

plus the pressures of time on the parties in preparing for the major preliminary injunction hearing, prevented that step from taking place. But this Court sees no reason to credit UAC's hypertechnical objections under the circumstances.

Even more significantly, Avaya presciently thought to head off such objections to its documents by submitting the Tompkins and Doebelin verifications (1) to provide "foundation" (again really authentication) and (2) to eliminate any hearsay objections by qualifying the documents as business records (see Rule 803(6)). Not content with that, as indicated earlier, UAC challenges those verifications as themselves flawed.

One of the most useful (though perhaps least noticed) accomplishments of the Judicial Conference's Advisory Committee on the Rules of Evidence during this Court's tenure as its Chairman was in adding a new Rule 902(11) to the self-authentication provisions of Rule 902. That new provision was intended to obviate the need for live witnesses to parade to the stand to support the admission into evidence of business records. And that goal was sought to be accomplished by providing the same type of certification procedure that had previously been available—as a real anomaly—only with respect to foreign records in criminal cases under 18 U.S.C. § 3505. Too few lawyers have caught up with that valuable amendment, even though it became effective just over five years ago. But in this case it appears that the Tompkins and Doebelin verifications are in reasonably substantial compliance with the new Rule.

If UAC's objections to the documentary exhibits themselves can fairly be characterized as hypertechnical (and they are), a new and more pejorative term would have to be coined as to the objections to the supporting verifications. If the latter are

indeed arguably flawed because the declarants did not parrot the familiar language of Rule 803(6) or Rule 902(11), any such omissions are obviously readily curable, and Avaya will be permitted to revise the verifications accordingly. In the meantime:

1. This Court has retained the references to the challenged documentary exhibits in the Findings.

2. It should be emphasized that the Conclusions reached by this Court would remain valid even without those references.